**T.A.M., INC. and E.L.G., Inc.**

v.

**GULF OIL CORPORATION.**

**Civ. A. No. 80–3173.**

United States District Court, E.D. Pennsylvania.

Sept. 21, 1982.

Neil Jokelson, Philadelphia, Pa., for plaintiffs.

Carole B. Dotson, Pittsburgh, Pa., for defendant.

OPINION

LOUIS H. POLLAK, District Judge.

I.

Plaintiffs Take a Minit Car Wash, Inc. ("T.A.M.") and E.L.G. Enterprises Corp. ("E.L.G.") are Pennsylvania corporations. Each operates a gasoline station and car wash. Defendant Gulf Oil Corporation ("Gulf") is a Pennsylvania corporation engaged, inter alia, in the business of refining and marketing motor fuels. Gulf terminated plaintiffs' Gulf franchises on February 20, 1981. T.A.M. had been an independently operated Gulf gasoline dealer since 1975 and E.L.G. since 1976.

During the course of their franchise relationships with Gulf, T.A.M.'s annual volume of gasoline sales averaged about 1.2 million gallons, and E.L.G.'s annual sales volume approximated 3 million gallons. Prior to June of 1980, both these dealers purchased their gasoline requirements exclusively from Gulf. At that time, the availability of gasoline at wholesale prices significantly cheaper than Gulf's prompted the plaintiffs to begin to purchase a substantial portion of their supply needs in the spot market. During the following months, a dispute arose as to whether the plaintiff dealers were entitled to accept the use of the Gulf credit card for consumer purchases of non-Gulf gasoline. Gulf notified the plaintiffs by letter, dated July 22, 1980, that it would not honor credit invoices for the sale of non-Gulf petroleum products. Plaintiffs filed suit on August 12, 1980 alleging that Gulf's policy constituted (1) a violation of both the Sherman and Clayton Acts, (2) a violation of the Emergency Petroleum Allocation Act of 1973 and the regulations promulgated thereunder, and (3) a breach of contract.

On August 15, 1980, plaintiffs received another letter from Gulf notifying them that, in view of their continuing breach of Gulf credit card policy, Gulf would no long-er accept their credit card invoices as immediate credit towards wholesale purchases of Gulf gasoline but would, instead, reimburse them, after an audit, for invoices from authorized purchases only. Upon receiving this letter, plaintiffs applied to this court for a temporary restraining order to restrain Gulf from implementing its allegedly new policies. At the hearing held on plaintiffs' application, the application was converted into a motion for a preliminary injunction, and, on November 17, 1980, ruling from the bench, I granted plaintiffs' motion to this extent: I enjoined Gulf from refusing to accept Gulf credit card invoices from sales of Gulf gasoline and other authorized products as credit against purchases of Gulf gasoline made by plaintiffs. I declined to enjoin Gulf from refusing to honor credit invoices for the sale of non-Gulf gasoline because plaintiffs had not shown any significant likelihood of success on the claim that Gulf's position on that score was illegal.

Meanwhile, on November 14, 1980, Gulf notified the plaintiffs that their franchises had been terminated because T.A.M. had purchased no Gulf gasoline since September 23, 1980 and E.L.G. had purchased no Gulf gasoline since October 16, 1980. These termination notices were to be effective immediately. Plaintiffs thereupon sought an order from this court to prevent Gulf from terminating their franchise. On November 19, 1980, again ruling from the bench, I enjoined Gulf from doing so without first giving ninety days notice pursuant to the Petroleum Marketing Practices Act. 15 U.S.C. § 2801 et seq. Gulf issued such notice on November 20, 1980, effectively terminating the franchises on February 20, 1981.[1]

On April 1, 1981, plaintiffs filed a second suit against Gulf (Civil Action No. 81–1281) alleging that Gulf's termination of plaintiffs' franchises constituted (1) an attempt to monopolize the sale of gasoline in viola-

---

1. By a letter agreement dated February 9, 1981, plaintiffs agreed to "forgo the right to enjoin Gulf from franchise termination at either location." By way of consideration, Gulf agreed to supply plaintiffs with unbranded gasoline until September 30, 1981. See Exhibit 1 to Defendant's Motion for Summary Judgment.

tion of section 2 of the Sherman Act; (2) an attempt to impose both (a) an exclusive dealing arrangement and (b) a tie-in, in violation of section 1 of the Sherman Act and section 3 of the Clayton Act; (3) an illegal termination under the Petroleum Marketing Practices Act, *supra;* (4) a violation of certain regulations promulgated by the Department of Energy ("D.O.E.") pursuant to the Emergency Petroleum Allocation Act of 1973, 10 C.F.R. §§ 210.61, 210.-62(a) (1980); and (5) a breach of contract. Plaintiffs' second complaint seeks damages but no injunctive relief, and this second action has been consolidated with plaintiffs' first complaint of August 12, 1980. Pursuant to Rule 56, F.R.Civ.P., defendant Gulf now moves for summary judgment on all of plaintiffs' outstanding claims.

## II.

In assessing defendant's Rule 56 motion, I am mindful that trial courts must resolve "all inferences, doubts and issues of credibility against the moving party." *Smith v. Pittsburgh Gage and Supply Company,* 464 F.2d 870, 874 (3d Cir.1972). I also recognize that trial courts must be particularly chary of granting summary judgment on antitrust claims where motive and intent often "play leading roles," *Poller v. Columbia Broadcasting System,* 368 U.S. 464, 473, 82 S.Ct. 486, 491, 7 L.Ed.2d 458 (1962), but this necessary chariness does not mean that a court should overlook Rule 56(e)'s requirement that a party opposing summary judgment "set forth specific facts showing that there is a genuine issue for trial." F.R. Civ.P. 56(e); *see First National Bank of Arizona v. Cities Service,* 391 U.S. 253, 288–90, 88 S.Ct. 1575, 1592–93, 20 L.Ed.2d 569 (1968).

I will consider whether summary judgment on plaintiffs' outstanding claims for damages is warranted treating those claims in the following order: (a) the exclusive dealing and tie-in claims under the Sherman and Clayton Acts, (b) the illegal termination claim under the Petroleum Market-

ing Practices Act ("PMPA"), (c) the breach of contract claim with respect to Gulf's termination of plaintiffs' franchises, and (d) the breach of contract claim in connection with Gulf's allegedly new policy regarding the use of Gulf credit cards. Plaintiffs have conceded that summary judgment is appropriate with respect to the remainder of their claims.

*The Exclusive Dealing and Tie-in Claims*
i.

Before addressing the merits of plaintiffs' antitrust claims, I must consider Gulf's affirmative defenses. Gulf contends that the undisputed facts demonstrate that this court lacks jurisdiction over these claims. I turn first to the jurisdictional issue under the Sherman Act.

Section 1 of the Sherman Act prohibits "every contract, combination ... or conspiracy, in restraint of trade or commerce among the several states." 15 U.S.C. § 1. Accordingly, to establish federal jurisdiction under the Act, the defendant's conduct must involve activities that are either in the flow of interstate commerce or, "while wholly local in nature, nevertheless substantially affect interstate commerce." *McLain v. Real Estate Bd. of New Orleans,* 444 U.S. 232, 241, 100 S.Ct. 502, 508, 62 L.Ed.2d 441 (1980). *See Harold Friedman, Inc. v. Thorofare Markets, Inc.,* 587 F.2d 127, 132 (3d Cir.1978).

Gulf contends that all of its activities pertinent to this case stand outside the flow of interstate commerce. It rests this contention on the undisputed fact that Gulf gasoline is refined at the Philadelphia, Pennsylvania refinery for delivery to service stations in the eastern half of the state.[2]

In *Canadian American Oil Co. v. Union Oil Co.,* 577 F.2d 468 (9th Cir.1978) the Ninth Circuit confronted a Sherman Act, section 1 "in commerce" determination virtually identical to the one at bar. There, the appellant gas station owners received

---

**2.** It is also undisputed that a large portion of the raw ingredients used in refining the gaso-

line are shipped to the Philadelphia refinery from out of state.

their allotments of Union Oil Company gasoline from an in-state refinery owned by Union. The court declared that "[n]o detailed exegesis of Union's production, refining, transporting, [and] marketing ... system is necessary to determine, as a matter of law, that Union's activities, including those in which it was engaged with the appellants," "occurred within the flow of interstate commerce" and supplied the necessary "interstate nexus." *Id.* at 471. I too am satisfied that Gulf's conduct of its business with plaintiffs—involving contractually based deliveries of tens of thousands of gallons of gasoline each week—was, "for jurisdictional purposes, an ingredient of [Gulf's] interstate production and distribution scheme." *Id.*

Even were I to find that Gulf's dealings with plaintiffs were "wholly local in nature," *McLain, supra,* 444 U.S. at 241, 100 S.Ct. at 508, I would nevertheless be compelled by Supreme Court case law to the conclusion that Gulf's alleged practices sufficiently affected interstate commerce to satisfy the alternative, "substantial effect" test for Sherman Act jurisdiction. *See, e.g., Goldfarb v. Virginia State Bar,* 421 U.S. 773, 95 S.Ct. 2004, 44 L.Ed.2d 572 (1975); *Hospital Building Co. v. Rex Hospital Trustees,* 425 U.S. 738, 96 S.Ct. 1848, 48 L.Ed.2d 338 (1976); *United States v. Women's Sportswear Mfrs. Assn.,* 336 U.S. 460, 464, 69 S.Ct. 714, 716, 93 L.Ed. 805 (1949).

I turn next to Gulf's challenge to the court's jurisdiction over plaintiffs' claims under section 3 of the Clayton Act. 15 U.S.C. § 14. That section provides:

It shall be unlawful for any person engaged in commerce, in the course of such commerce, to lease or make a sale or contract for the sale of goods ... supplies, or other commodities ... for use ... or resale on the condition, agreement, or understanding that the lessee or purchaser thereof shall not use or deal in the goods ... of a competitor or competitors of the ... seller, where the effect of such lease, sale, or contract for sale or such condition, agreement or understanding may be to substantially lessen competition ... in any line of commerce. 15 U.S.C. § 14.

In contrast to section 1 of the Sherman Act, the "distinct 'in commerce' language" of this provision of the Clayton Act, "appears to denote only persons or activities within the flow of interstate commerce." *Gulf Oil Corporation v. Copp Paving Company, Inc.,* 419 U.S. 186, 195, 95 S.Ct. 392, 398, 42 L.Ed.2d 378 (1974).[3]

In *Copp,* the Court described Clayton Act, section 3's "in commerce" requirement as denoting "the practical, economic continuity in the generation of goods and services for interstate markets and their transport and distribution to the consumer." 419 U.S. at 195, 95 S.Ct. at 395; *see also Swift and Co. v. U.S.,* 196 U.S. 375, 25 S.Ct. 276, 49 L.Ed. 518 (1905); *Standard Oil Co. v. FTC,* 340 U.S. 231, 71 S.Ct. 240, 95 L.Ed. 239 (1951). The considerations which prompted me to find that the Sherman Act's "in commerce" test was met in this case also persuade me that Gulf's dealings with plaintiffs fall within the kind of "practical economic" continuum which the court put forward as defining the scope of Clayton Act, section 3 jurisdiction.[4]

---

**3.** The proposition that the Clayton Act's jurisdictional reach extends beyond this "in commerce" requirement to embrace—in common with the Sherman Act—all activities having a substantial effect on interstate commerce is one that is not "without at least a measure of support." *Copp, supra,* 419 U.S. at 202 and n. 18, 95 S.Ct. at 402 & n. 18 (citing *Standard Oil Co. of California and Standard Stations v. United States,* 337 U.S. 293, 69 S.Ct. 1051, 93 L.Ed. 1371 (1949)). But the court has intimated its strong disapproval of such an "expansion of the Clayton Act's scope beyond that which the statutory language defines." *Id.*

**4.** The in commerce requirement common to the Sherman Act and § 3 of the Clayton Act stands in contrast to the more rigorous jurisdictional standard imposed by § 2 of the Clayton Act which requires not only that the purportedly illegal activity take place in the course of interstate commerce, but that an actual interstate sale in violation of that section also occur. *Copp* 419 U.S. at 195, 95 S.Ct. at 398. *See also, Belliston v. Texaco, Inc.,* 455 F.2d 175 (10th Cir.1972); *Detroit City Dairy, Inc. v. Kowalski Sausage Co., Inc.,* 393 F.Supp. 453, 476 (E.D. Mich.1975).

Accordingly, I will reject defendant's affirmative defenses and proceed to consider its arguments for summary judgment on the merits of plaintiffs' antitrust claims.

ii.

■ Turning to plaintiffs' exclusive dealing claims, I will first assess the claim under section 3 of the Clayton Act. 15 U.S.C. § 14. I do so because that section imposes "stiffer standards of anticompetitiveness" upon exclusive dealing arrangements than does section 1 of the Sherman Act. *American Motor Inns, Inc. v. Holiday Inns, Inc.,* 521 F.2d 1230, 1239 (3rd Cir.1975). Accordingly, if a plaintiff cannot establish that an exclusive dealing agreement infringed section 3 of the Clayton Act, the agreement "would, a fortiori, be lawful under the less restrictive provisions of the Sherman Act." *Id. See Tampa Electric Co. v. Nashville Coal Co.,* 365 U.S. 320, 327, 335, 81 S.Ct. 623, 627, 632, 5 L.Ed.2d 580 (1961).

The first inquiry I must undertake is whether exclusive dealing agreements or understandings in fact existed between Gulf and plaintiffs. *Tampa Electric, supra,* 365 U.S. at 329–30, 81 S.Ct. at 629. Gulf claims that undisputed facts demonstrate that no such agreements existed and that plaintiffs have mustered no evidence to the contrary. Gulf supports this assertion by reference to the written terms of its contracts with T.A.M. and E.L.G. which do not specifically delineate that the dealers buy their gasoline solely from Gulf, and by its letter of July 22, 1980 which purported to express Gulf's acquiescence in the dealers' purchase of products from Gulf competitors.

■ However, the plaintiffs have advanced evidence to suggest that despite the absence of express conditions in their contracts, de facto exclusive dealing agreements may have been in effect throughout the duration of their franchise relationships with Gulf. Depositions taken from Gulf's marketing agents, including its retail sales manager for the district of Philadelphia, indicate that they understood and acted upon the assumption that Gulf dealers were obligated to market Gulf gasoline alone. Whether or not an exclusive dealing contract existed is a material issue of fact in dispute, one which would be appropriate for jury consideration in determining whether an infringement of the Clayton Act has occurred. Viewing the evidence most favorably to the plaintiffs for the purposes of this motion, and taking into account the likely inequality of bargaining power between Gulf and its individual dealers, *see Tire Sales v. Cities Service Oil Co.,* 637 F.2d 467, 474 (7th Cir.1980); *Advance Business Systems & Supply Co. v. SCM Corporation,* 415 F.2d 55, 63–64 (4th Cir.1969), cert. denied 397 U.S. 920, 90 S.Ct. 928, 25 L.Ed.2d 101 (1970), it is clear that summary judgment on this issue in Gulf's favor is unwarranted.

In view of my obligation to read the evidence in a light most favorable to plaintiffs, I will assume, for purposes of this motion, that plaintiffs can prove not only that an exclusive dealing arrangement was imposed on them but also that Gulf imposed such agreements on all of its dealers in the Philadelphia area.[5] This assumption is critical for undertaking my second inquiry: whether the exclusive dealing agreements between Gulf and plaintiffs—the existence of which I am now assuming—were unlawful. In *Tampa Electric, supra,* the Supreme Court set forth a three-step analysis for evaluating the legitimacy of exclusive dealing arrangements under the Clayton Act:

> First, the line of commerce ... involved must be determined, where it is in controversy, on the basis of the facts peculiar to the case. Second, the [geographic] area of effective competition in the known line of commerce must be charted .... Third, and last, the competition foreclosed by the contract must be found to constitute a substantial share of the relevant market.

365 U.S. at 327–28, 81 S.Ct. at 627–628.

In this case, there is no dispute that the line of commerce involved is gasoline. The parties also agree that the relevant market area is greater Philadelphia.

5. See deposition of W.T. Kratz, Gulf Sales Supervisor, dated January 7, 1981 at 45–47.

Thus, whether summary judgment may be entered for Gulf with respect to the plaintiffs' Clayton Act, and, by implication, their Sherman Act, exclusive dealing claims, depends upon consideration of the third step of the *Tampa Electric* analysis. To determine whether the exclusive dealing contracts in issue foreclosed competition in a substantial share of the relevant market,

> it is necessary to weigh the probable effect of the contract on the relevant area of effective competition, taking into account the relative strength of the parties, the proportionate volume of commerce involved in relation to the total volume of commerce in the relevant market area, and the probable immediate and future effects which pre-emption of that share of the market might have on effective competition therein.

*Tampa Electric, supra,* 365 U.S. at 329, 81 S.Ct. at 629.

In addition, "*Tampa Electric* makes clear that in deciding whether an exclusive dealing contract violates section 3, the judiciary must take into account the economic justification for the arrangement." *American Motor Inns, Inc. v. Holiday Inns, Inc.,* 521 F.2d 1230, 1251 (3d Cir.1975).

The statistical evidence bearing on whether a censurable foreclosure of competition may have occurred is not in dispute. Gulf's market share in the Philadelphia area is approximately 7%[6] which places Gulf sixth in market share size among the thirteen major gasoline suppliers in the area. Exhibit C–1, Defendant's Additional Briefing on its Motion for Summary Judgment. Of the approximately 3,000 gasoline stations in the area Gulf has 149 retail outlets or 5% of the total. These figures persuade me that even assuming that exclusive dealing agreements existed during the period embraced by the complaint, it is not likely that the agreements substantially lessened competition in the Philadelphia market.

Plaintiffs contend that a comparison of the facts here to those in *Standard Oil Co. v. United States,* 337 U.S. 293, 69 S.Ct. 1051, 93 L.Ed. 1371 (1949), should lead me to a contrary conclusion; it does not. In that case

> the impact of the requirements contracts was studied in the setting of the large number of [Standard Oil] gasoline stations—5,937 or 16% of the retail outlets in the relevant market—and the large number of contracts, over 18,000, together with the great volume of products involved. *Tampa Electric,* 365 U.S. at 328–29 [81 S.Ct. at 628–29] (distinguishing *Standard Oil*).

Standard Oil, moreover, was the largest seller among six major competitors and accounted for 23% of total gasoline sales in the area. Gulf is sixth among thirteen and has a 7% market share. *See Blackwell v. Power Test Corp.,* 540 F.Supp. 802 (D.C.N.J. 1981) aff'd, 688 F.2d 818 (3d Cir.1982) ("Power Test is the sixth largest seller in the relevant market with a 6% market share, unlike the defendant in *Standard Oil Co.* . . .").

Not only is *Standard Oil* distinguishable on its facts, but I must take account of the fact that the Court has departed from the standard it then employed for measuring the legality of exclusive dealing contracts under section 3 and adopted one which "requires the courts actually to evaluate . . . the economic usefulness of the challenged practice in relation to the business factors extant in the market." *American Motors Inn, Inc., supra,* 521 F.2d at 1251 n. 75.

In particular, the Court has observed with respect to limited term requirement contracts like those at bar[7] that such agreements may have the beneficial purpose of "insur[ing] to the customer a sufficient supply of a commodity vital to the customer's trade." *Brown Shoe v. United States,* 370 U.S. 294, 330, 82 S.Ct. 1502, 1526, 8 L.Ed.2d

**6.** Gulf's share of the Pennsylvania market has declined from 7.9% in 1977 to 5.92% in 1981. Exhibit 5–1, Defendant's Motion for Summary Judgment.

**7.** Gulf's alleged exclusive dealing requirement contracts with plaintiffs were of three year duration. Exhibit 7, Defendant's Motion for Summary Judgment.

510. Deposition testimony of another Gulf dealer, Mr. D. Baltista, and, indeed, the testimony of the owners of T.A.M. and E.L.G., Messrs. Sydney and Elliot Goldstein, confirm that such was the case with the challenged contracts. Elliot Goldstein recounted that gasoline was available on the spot market only at times of market glut and that at other times he depended on Gulf as a regular and reliable source.

█ Accordingly, because the undisputed facts confirm that the probable effects of the challenged contracts on competition in the Philadelphia market were not substantial and in light of the contracts' economic usefulness, I conclude that summary judgment in Gulf's favor is appropriate with respect to plaintiffs' exclusive dealing claims under section 3 of the Clayton Act and under section 1 of the Sherman Act.

### iii.

█ Antitrust law defines a tying arrangement as "an agreement by a party to sell one product but only on the condition that the buyer also purchases a different (or tied) product." *Northern Pacific Ry. v. United States,* 356 U.S. 1, 5–6, 78 S.Ct. 514, 518, 2 L.Ed.2d 545 (1958). Thus, in order to make out a tying claim a plaintiff must, as an initial matter, establish the existence of two entities, a "tying" product and a "tied" product. *Times-Picayune Publishing Co. v. United States,* 345 U.S. 594, 605, 73 S.Ct. 872, 878, 97 L.Ed. 1277 (1953). T.A.M. and E.L.G. contend that in this case the Gulf trademark and franchise constituted the tying product and Gulf gasoline the tied product. Gulf argues that neither its trademark nor its franchise can be deemed "products" separate from Gulf gasoline for the purpose of establishing a violation of the tying prohibition of the Sherman or Clayton Act.

█ Again, at the outset, it is necessary to draw a distinction between the Clayton and Sherman Acts. Although tying arrangements are illegal under either act, *International Salt Co. v. United States,* 332 U.S. 392, 68 S.Ct. 12, 92 L.Ed. 20 (1947), section 3 of the Clayton Act, by its terms, requires that both tying and tied products

be "goods, wares, merchandise, machinery, supplies or other commodities." 15 U.S.C. § 14. Because Gulf's trademark and franchise plainly fall outside this rubric, *cf. Ungar v. Dunkin' Donuts of America, Inc.,* 531 F.2d 1211, 1215 n. 4 (3d Cir.1976); *Advance Business Systems & Supply Co. v. SCM Corp.,* 415 F.2d 55, 64–5 (4th Cir.1969), plaintiffs' tying claim under the Clayton Act must fail.

However, in Sherman Act tying cases at least two circuit courts and some district courts have considered trademarks and franchise systems to be "tying" products separate from tied items such as repair parts or the equipment used in franchise operations. *See Siegel v. Chicken Delight,* 448 F.2d 43 (9th Cir.1971) (trademark and franchise licenses are separate products from "tied" items such as cookers, fryers, packaging materials and mixes); *Warriner Hermetics, Inc. v. Copeland Refrigeration Corp.,* 463 F.2d 1002 (5th Cir.), *cert. denied,* 409 U.S. 1086, 93 S.Ct. 688, 34 L.Ed.2d 673 (1972) (franchised trademark separate from "tied" repair parts); *Aamco Automatic Transmissions, Inc. v. Taylor,* 407 F.Supp. 430 (E.D.Pa.1976) (*id.*). *But see Susser v. Carvel Corporation,* 332 F.2d 505 (2d Cir. 1964), *cert. dismissed,* 381 U.S. 125, 85 S.Ct. 1364, 14 L.Ed.2d 284 (1964) (refusing to treat franchise system and trademark as "tying" products); *Reed v. Shell Oil Co.,* 524 F.2d 1054 (10th Cir.1975) (Shell trademark "cannot be considered as a 'product'").

The Third Circuit panel in *Ungar, supra,* 531 F.2d at 1215 n. 4, intimated a certain dubiety respecting those opinions which have deemed trademarks and franchise systems separate tying products sufficient for purposes of the Sherman Act. But the cases which have so held are, in any event, distinguishable from the one at bar. For these cases stand "only for the unremarkable proposition that, under certain circumstances, a trademark may be *sufficiently unrelated* to the alleged tied product to warrant treatment as a separate item." *Krehl v. Baskin-Robbins Ice Cream Co.,* 664 F.2d 1348, 1352 (9th Cir.1982) (emphasis

added) (distinguishing *Chicken Delight, supra,* and holding that Baskin-Robbins trademark lacked "sufficient independent existence apart from the ice cream products" sold by franchisees).

■ I find the *Baskin-Robbins* analysis applicable to this case. As in *Baskin-Robbins,* the Gulf trademark's function here is merely "to identify the alleged tied product," *id.* at 1354.[8] Gulf's franchises, like Baskin-Robbins, were established to serve as retail outlets for goods intimately associated with the trademark adorning their premises. To extend the law of tying to cover such claims as the one at bar would be to overlook the evil which the law was fashioned to control. The tying prohibition strikes at "the use of a dominant *desired* product to compel the purchase of a second *undesired* product." *Id.*[9] Plaintiffs cannot claim that Gulf imposed an unwanted commodity upon them by tying the product Gulf gasoline to the Gulf franchise. It was the franchise with its attendant right to sell Gulf gasoline which plaintiffs bargained for in becoming franchisees.

Accordingly, summary judgment will be granted for defendant on plaintiffs' remaining Sherman Act claim.

### Plaintiffs' Petroleum Marketing Practices Act Claim

■ Section 2802(a) of the Petroleum Marketing Practices Act ("PMPA") creates a general prohibition barring "franchisors engaged in the sale ... or distribution of motor fuels" from terminating any franchise prior to its expiration date except under certain circumstances. 15 U.S.C. § 2802(a). These circumstances or "grounds for termination" are set forth in § 2802(b) of the Act. 15 U.S.C. § 2802(b).

Gulf claims that T.A.M.'s and E.L.G.'s respective failures to purchase any Gulf gasoline for a period of roughly one month before the two franchisees received notices of termination constituted adequate grounds for termination under two separate provisions of § 2802(b).

First, Gulf invokes § 2802(b)(2)(C) which provides that a proper ground for termination is the "occurrence of an event which is relevant to the franchise relationship and as a result of which termination ... is reasonable." 15 U.S.C. § 2802(b)(2)(C). This general "reasonableness" provision finds definition in § 2802(c). Subsection (c) sets out a nonexhaustive list of twelve "events" which render termination "reasonable." 15 U.S.C. § 2802(c). One such "event" is the "failure of the franchisee to operate the marketing premises for—7 consecutive days." 15 U.S.C. § 2802(c)(9)(A). And Gulf contends that plaintiffs' conduct constituted such a "failure."

I cannot agree with Gulf's reading of § 2802(c)(9)(A). That provision censures failures to "operate" gas stations for seven consecutive days. As far as the record reveals, plaintiffs are blameless on this score. Gulf would have me import into subsection (c)(9)(A) the additional requirement that "operating" a gas station entails purchasing gasoline from the franchisor at least once a week. Had Congress intended such a requirement it could have included appropriate language.[10]

Gulf's second "ground for termination" relies on § 2802(b)(2)(A) which condemns a failure by the franchisee to comply with any provision of the franchise which provision is both reasonable and of material significance to the franchise relationship...

---

**8.** By contrast, the tied products in *Chicken Delight* were commonplace articles, and the franchisor in that case could "maintain its quality standards through other means less intrusive upon competition." *Id.*

**9.** See also *Northern Pacific Ry. Co., supra,* 356 U.S. at 11, 78 S.Ct. at 521 ("the vice of tying arrangements lay in the use of economic power in one market to restrict competition in another").

**10.** Since the PMPA was intended, inter alia, to prevent arbitrary franchise terminations, *see generally* Senate Report No. 95–731, 95th Cong. 2d Session, 15–19, 29–43, U.S.Code Cong. & Admin.News 1978, p. 873, it would appear that a strict requirement that a franchisee purchase gas each week would run counter to the Act's purpose.

15 U.S.C. § 2802(b)(2)(A). The difficulty with Gulf's argument on this ground is that it is not possible to surmise from this record exactly what contractual obligations the plaintiffs were under regarding the quantities of gas which they purchased from Gulf. Gulf claims that plaintiffs' "Commodity Schedules,"[11] disclose that plaintiffs agreed to purchase their "requirements" from Gulf, and Gulf cites the standard found in section 2–306 of the Uniform Commercial Code that "requirements" be such as occur in "good faith." Although this argument carries some weight, countervailing considerations undercut the seemingly clear mandate on which Gulf relies.

First, Gulf has argued that its contracts with plaintiffs did not require them to purchase all their gasoline from Gulf, and it stated as much in its letter to plaintiffs of July 22, 1980.[12] Thus, at least with respect to the period in which plaintiffs failed to purchase Gulf gasoline Gulf cannot now rely on the proposition that "requirements" meant all the gasoline that plaintiffs purchased. It must, then, be taken to denote some more particularized or subjective assessment of "requirements" on plaintiffs' part, and not their objective requirements, subject to reasonable upper limits, as the term is commonly used. What minimum amounts of gasoline plaintiffs were obliged to purchase from Gulf to meet their "good faith" duty would properly be a question for the fact-finder to determine.

A second consideration militating against Gulf's motion for summary judgment lies in the fact that the "Provisional Payback Agreements" between the parties[13] specify that Gulf can terminate the franchise if the plaintiffs fail to purchase Gulf branded gasoline for a period of ninety consecutive days. This provision was not breached at the time Gulf notified the plaintiffs of their franchise terminations. Although the significance of this provision is far from clear in light of the suggested monthly purchases also set out in the Provisional Payback Agreements and the "good faith" requirements issue noted above, I have concluded that the resolution of the parties' respective duties on this front is a task for the fact-finder. For the purposes of this motion, I find that, in the absence of uncontroverted proof that plaintiffs breached a contractual obligation more stringent than the ninety day term in the Provisional Payback Agreements, the plaintiffs may have been entitled to rely on that term.[14]

A final and more general consideration is this. Insofar as Gulf claims to have relied on plaintiffs' "good faith" obligation to purchase Gulf gasoline, it would appear to have been fitting for Gulf to have acted in accordance with § 2802(b)(2)(B) of the PMPA. That provision permits franchise termination on the ground of a franchisee's failure "to exert good faith efforts to carry out the provisions of the franchise," provided that the franchisee is first given written notice of such failure and a reasonable opportunity to remedy it. Gulf does not rely on this good faith provision of the Act, because it did not afford plaintiffs notice of or an opportunity to cure their alleged failure to fulfill their contractual obligations.[15]

---

11. See Exhibit 7, pp. 1, 3, 4, 10, 20, 23, Defendant's Motion for Summary Judgment.

12. See Exhibit 8, pp. 1–2, Defendant's Motion for Summary Judgment.

13. See Exhibit 7, pp. 5, 17, 30, Defendant's Motion for Summary Judgment.

14. This seems especially appropriate inasmuch as Gulf could have modified the terms of their contractual relations with plaintiffs under § 2802(b)(3)(A) of the PMPA. Since Gulf did not, it appears fair to draw such inferences as I have drawn in plaintiffs' favor, according plaintiffs, for the purposes of this motion, the broad protection afforded by the ninety day term.

15. In the interest of narrowing the issues for trial in this matter—if trial is necessary, which I strongly believe should not be the case—I think it appropriate to dispose, as a matter of law, of one other argument put forward by plaintiffs under this head. Plaintiffs contend that Gulf was under a contractual obligation to give plaintiffs an opportunity to correct any conduct alleged to be in violation of the franchises. The notice requirement upon which plaintiffs rely is found in their respective "Contracts of Sale." Exhibit 7, pp. 1, 8, Defendant's Motion for Summary Judgment. The contracts each provide that if the franchisee engages in or permits "any illegal or improper act on or about the premises where Gulf identification is

Accordingly, summary judgment will be denied on plaintiffs' PMPA claims.

### Plaintiffs' Breach of Contract Claim

■ I cannot agree with plaintiffs that a breach of contract claim against Gulf could conceivably be sustained upon the set of facts before me. E.L.G. and T.A.M. have submitted affidavits by their respective owners to the effect that each plaintiff, at the time it first became a Gulf dealership, was told by a Gulf representative that Gulf gasoline would be offered to it on a competitive price basis.[16] Plaintiffs contend that these representations constituted oral additions to their written agreements with Gulf and that these oral terms were breached when Gulf, concededly, ceased to offer its gasoline at competitive prices.

The fatal difficulty with plaintiffs' claim is that the evidence on which it relies would be barred by the parole evidence rule, since the contracts between the parties appear on this score to be complete ones. *American Bank and Trust Co. of Pa. v. Lied*, 487 Pa. 333, 409 A.2d 377 (1979). Plaintiffs argue that because the contracts lack specific price terms they are not complete statements of the parties' respective rights and duties for purposes of disposing of this claim. I disagree.

Although plaintiffs are correct in contending that the Uniform Commercial Code ("UCC") provision, section 2–305, regarding open price terms is not in and of itself dispositive with respect to an agreement's completeness, a close look at the contracts at bar and the circumstances of the parties in the light of this provision reveals that the contracts do embody complete agreements. Section 2–305 of the UCC provides for the formation of a contract in circumstances where the price term cannot be settled at the time of contract-making. Subsection 2 of the provision allows for two parties to a contract to agree that a price be fixed by the seller in good faith. The contracts in issue are such agreements. The parties' successive Commodity Schedules incorporated by reference into their initial Contracts of Sale stipulate that the seller's price in effect at the time and for the place of delivery will be the price basis. Considering the nature of the petroleum market, and the length of time for which the contracts were to run, it appears quite clear that the parties had no options but to operate on an open price basis. In any case, there is no indication that this stipulation was not an expression of the parties' complete agreement as to prices. This proposition is supported by reference to the integration clause included in the Contracts of Sale. Moreover, there is no evidence that the prices which Gulf did fix were arrived at in any fashion other than in good faith. The plaintiffs have not alleged that the prices they were asked to pay differed from those demanded of other Gulf dealers, or that Gulf's gasoline prices at the time in issue varied significantly from other major brand suppliers with which Gulf may appropriately be compared. *Itin Oil Co. v. Mobil Oil Corp.*, 527 F.Supp. 898, 900–01 (E.D. Mich.1981).

Finally, it appears from their affidavits that plaintiffs were aware of some disparity between Gulf prices and those of other gasolines at the time they came under contract. Despite this knowledge, and despite opportunities to renegotiate these contracts and price terms in subsequent years, plaintiffs entered into virtually identical commodity schedule agreements. Whether they did so for the collateral benefits derived from their status as Gulf franchisees, or for some other reason, the significant consideration is

displayed," Gulf may terminate the franchise if, after written notice, the franchisee fails to discontinue such acts. Plaintiffs argue that this provision guarantees that the franchisee be given an opportunity to cure any failure to meet its *contractual* terms before Gulf may terminate the franchise. But the contract language plainly applies only to situations where the franchisee's conduct threatens to damage

Gulf's reputation, by associating it with illegal or controversial activity. It would thus not affect Gulf's right to terminate under the PMPA 2802(b)(2)(A) for any material breach of a reasonable contractual provision.

**16.** See Exhibit 8, Plaintiffs' Answer to Defendant's Motion for Summary Judgment.

that plaintiffs were well aware of the terms of their contracts with Gulf. It is safe, therefore, to conclude that the open price term, in addition to being necessary to accommodate a fluctuating market, was also acceded to by plaintiffs. To hold parole evidence admissible on facts such as these would erode the ability of parties confidently to enter open price contracts by encouraging buyers to invoke evidence extrinsic to their written agreements whenever they were dissatisfied with the price fixed by a seller, regardless of whether the seller acted in good faith according to the contract terms.

Even were I to allow the introduction of parole evidence, Gulf's alleged promise to maintain "competitive" prices would scarcely provide this court with significant guidance. A reading of the affidavits strongly suggests that any statements made by Gulf agents regarding prices fall under the rubric of encouragement and not promise.

Accordingly, it would be inappropriate to vary the terms of the written contract, and defendant's motion for summary judgment with respect to plaintiffs' breach of contract claim will be granted.

### Plaintiffs' Credit Card Claim

Plaintiffs seek to recover damages arising from Gulf's refusal after November 17, 1980 to honor credit invoices for the sale of non-Gulf gasoline.[17] In my November 17, 1980 bench opinion ruling on plaintiffs' motion for preliminary injunction against Gulf's allegedly new credit card policies, I thoroughly canvassed both the contractual and regulatory grounds on which plaintiffs base their claims of Gulf's liability on this issue.[18]

With respect to plaintiffs' contract-based arguments, I observed that the travel card agreement in issue provides that Gulf may vary the terms of its contract by issuing written announcements. And the evidence before me supported the conclusion that Gulf could and did, pursuant to that agreement, vary the products for which its credit cards could be used. I found, moreover, that plaintiffs had introduced no evidence limiting the breadth of this provision. Plaintiffs argued rather that Gulf was estopped by past practice from imposing such limits on the credit card.

■ To prevail on the detrimental reliance theory which plaintiffs advanced—and which they apparently continue to press—plaintiffs had to establish not only that they relied, but also that such reliance was reasonable. *Paris Construction Co. v. Research-Cottrell*, 451 F.Supp. 938 (W.D.Pa. 1978). Assuming for the purposes of that motion that plaintiffs could show past practices or past commitments on Gulf's part honoring credit invoices for sales of non-Gulf gasoline—a showing they failed to make—I concluded that such reliance on past practice would be unreasonable in light of the express language of the contract. I now adopt that conclusion and the reasoning more fully set forth in my bench opinion for the purpose of ruling on Gulf's motion for summary judgment.

With respect to plaintiffs' claim that Gulf's allegedly new policy of refusing to honor credit invoices on non-Gulf gas violated section 210.62(a) of the Department of Energy's General Allocation and Price Rules, 10 C.F.R. § 210.62(a), I reasoned that in order to prevail on that claim plaintiffs had to show that Gulf had carried out a change adverse to plaintiffs in the credit terms which it had offered as of May 15, 1973. I found that plaintiffs had failed to make even a prima facie showing as to Gulf's credit practices on May 15, 1973.

---

**17.** To the extent that plaintiffs' complaints and later submissions may be read to claim damages arising from Gulf's refusal to honor credit invoices for sales of non-Gulf products other than gasoline, such claims are moot because Gulf never in fact acted upon that basis during the period from plaintiffs' first complaint to the franchise terminations. While it asserted a right to so act, Gulf was prevented from doing so, first, by an agreement entered into by the parties at the time of the September, 1980 hearing on plaintiffs' T.R.O. application, and then by my preliminary injunction of November 17, 1980.

**18.** In opposing Gulf's motion for summary judgment, plaintiffs have submitted no further briefing nor any additional evidence in support of these claims.

Noting that a failure to assert rights can itself, under some circumstances, become a business practice,[19] I observed that plaintiffs could try to shore up their claim under section 210.62(a) by attempting to demonstrate that as of May 15, 1973 Gulf failed to audit invoices for non-Gulf gasoline. But I also found that plaintiffs had introduced no evidence showing 1973 credit card sales of non-Gulf gasoline by Gulf dealers which expectably would have triggered a reaction from Gulf. Indeed, I found that the evidence supported the view that, until the large price differentials began to occur in 1979, few Gulf dealers sold non-Gulf gasoline.

As I have already noted, plaintiffs have failed to muster any further evidence in support of this claim, and for the reasons stated and those more fully set forth in my bench opinion, I am now compelled to the conclusion that the evidence which plaintiffs have submitted fails to raise any material issue of fact for trial on plaintiffs' § 210.62(a) claim regarding credit card use.

Accordingly, summary judgment will be entered for Gulf on plaintiffs' claims for damages arising from Gulf's challenged credit card policy, as well as on all other issues with the exception of the claim arising under the PMPA.

See also D.C., 535 F.Supp. 916.

---

**19.** See *Guyer v. Cities Service Co.*, 381 F.Supp. 7 (E.D.Wisc.1974).