**KELLAM ENERGY, INC., a Virginia corporation as Successor to Kellam, Inc. and Shore Atlantic, Inc., Plaintiff,**

**v.**

**Robert M. DUNCAN, t/a Super Soda, a Delaware resident, and R.C. Nehi Bottling, Inc., t/a Super Soda, a Delaware corporation, Defendants.**

No. Civ. A. 84–579—CMW.

United States District Court,
D. Delaware.

Aug. 19, 1987.

Charles S. Crompton, Jr., and W. Harding Drane, Jr., of Potter, Anderson & Corroon, Wilmington, Del. (Willcox & Savage, Norfolk, Va., of counsel), for plaintiff.

William J. Wier, Jr., Joseph G. Krauss, of Herlihy & Wier, Wilmington, Del. and R. Brandon Jones, of Hudson, Jones, Jaywork & Williams, Dover, Del., for defendants.

TABLE OF CONTENTS

| | PAGE |
|---|---|
| FACTS | 866 |
| I. THE PARTIES | 866 |
| A. Plaintiff | 866 |
| B. Defendants | 867 |
| II. THE ECONOMIC RELATIONSHIP | 867 |
| III. THE SEVEN CONTRACTS AT ISSUE | 869 |
| IV. THE LITIGATION | 870 |
| DISCUSSION | 871 |
| I. SUMMARY JUDGMENT IN COMPLEX LITIGATION | 871 |
| II. DEFENDANTS' MOTION FOR PARTIAL SUMMARY JUDGMENT ON THE CONTRACT CLAIM | 872 |
| A. The Regulations and Their Interpretations | 872 |
| B. Changed Business Practices | 874 |
| 1. The Contracts' Length | 874 |
| 2. The Requirements Provisions | 875 |
| 3. The Equipment Purchase Term | 875 |
| III. PLAINTIFF'S MOTION FOR SUMMARY JUDGMENT ON THE BREACH OF CONTRACT: THE COMMON LAW UNFAIR COMPETITION: AND THE ANTI-TRUST COUNTERCLAIMS | 876 |
| A. The Contract Counterclaim | 876 |
| 1. The Covenant Not to Compete | 876 |
| 2. The Oral Contract Modification | 877 |
| 3. The Written Contract Terms | 878 |
| B. The Unfair Competition Counterclaim | 879 |
| C. The Antitrust Counterclaims | 880 |
| 1. Tying | 880 |
| a. Sale of the Tied Product | 881 |
| b. Coercion | 881 |
| 2. Exclusive Dealing | 883 |
| a. Whether An Arrangement Existed | 883 |

| | | | | PAGE |
| --- | --- | --- | --- | --- |
| | b. | A Significant Anti-Competitive Effect | | 884 |
| | | i. | The Relevant Line of Commerce | 884 |
| | | ii. | Significant Impact on Competition | 885 |
| 3. | Resale Price Maintenance | | | 886 |
| 4. | Attempted Monopolization | | | 888 |
| | a. | The Relevant Product Market | | 888 |
| | b. | Dangerous Probability of Success | | 890 |
| | | i. | Logical Problems with the Market Share Data | 890 |
| | | ii. | The Market Share Data | 890 |
| | | iii. | Other Factors Beyond Market Share | 891 |
| IV. | CONCLUSION | | | 892 |

## OPINION

CALEB M. WRIGHT, Senior District Judge.

In this breach of contract action the defendants asserted counterclaims based on the federal antitrust laws and sundry state and common law claims. The matter is before the Court on Cross Motions for Summary Judgment.

The action was brought by Plaintiff, Kellam Energy, Inc. ("Kellam"), a Virginia corporation that is a wholesale distributor of petroleum in Delaware, Maryland and Virginia. The Defendant is R.C. Nehi Bottling, Inc. ("Nehi"), a Delaware soft drink bottling corporation that operates a chain of "Super Soda" convenience stores which sell beverages, groceries and snacks, as well as gasoline. Robert M. Duncan ("Duncan"), a Delaware resident and chief executive officer of Nehi, is the other defendant.

The Court denies Nehi's Summary Judgment Motion on Kellam's contract claim. There remains an unresolved factual question concerning whether certain contracts between the parties violated federal petroleum regulations.

The Court also denies Kellam's Motion for Summary Judgment on the contract counterclaim, holding that there exists a factual dispute as to whether Kellam breached the contracts by charging Nehi too high a price for petroleum. The Court, however, grants plaintiff's Motion for Summary Judgment on the Unfair Competition counterclaim, because it does not state a viable common law cause of action in Delaware.

The Court grants in part and denies in part plaintiff's Motion for Summary Judgment on the four antitrust counterclaims. The Court rules that defendants' tying counterclaim merits summary judgment because there is no evidence that the tying arrangement was forced upon Nehi. The Court also finds that the requirements contracts signed between Kellam and Nehi could not have constituted exclusive dealing, in violation of Clayton Act § 3, because no exclusive dealing arrangement existed. The Court holds that Kellam's sales methods may have constituted resale price maintenance in violation of the Sherman Act § 1, so that summary judgment is denied on this counterclaim. Finally, the Court denies summary judgment on defendants' attempted monopolization counterclaim.

## FACTS

### I. THE PARTIES

#### A. Plaintiff

Kellam is a regional distributor of gasoline, diesel fuel, propane gas, and home heating oil. The Company, since 1938, has sold to both retail outlets and individual consumers on the Delmarva Peninsula. The Peninsula is an isolated, rural tri-state area that includes portions of Delaware, Maryland and Virginia. Kellam also operates, on the Peninsula, a chain of convenience stores through its wholly-owned subsidiary, Shore Stop Inc. ("Shore Stop"). Both Kellam and Shore Stop are headquartered in Belle Haven, Virginia.

Kellam is a wholesale gasoline jobber. That is, it purchases oil from a large refiner—Texaco—and distributes it to retailers on the Delmarva Peninsula. The Company

sells gasoline through an established dealer network using, primarily, requirements contracts. Under these agreements, Kellam installs, at the retailer's facility, underground tanks, gasoline dispensing equipment, and Texaco signs—an investment of approximately $70,000 per station. The contracts stipulate that Kellam must service this equipment and supply the retail outlet with all of its gasoline needs. In exchange for Kellam's services, the retail dealer agrees, *inter alia,* that it will purchase all of its gasoline requirements to be sold at a particular location from Kellam Energy. To perform its obligations, Kellam must maintain a staff of service technicians, own a fleet of gasoline transports and operate several bulk distribution plants. In the 1960s Kellam was one of the first companies on the Peninsula to install self-service gasoline dispensing equipment.[1]

Kellam's predecessor corporations, Shore Atlantic, Inc. and Kellam, Inc., concentrated almost exclusively on retail gas sales. In 1979, all this changed. Kellam took the decision to integrate forward into the convenience store business; Shore Stop, Inc. was incorporated to direct Kellam's new venture.

Shore Stop opened its first convenience store in Machipongo, Virginia in March, 1981, and three more Virginia outlets followed shortly thereafter. In 1982, however, Kellam seized a rare opportunity to expand its convenience store business when Banks Dairy Markets, Inc. which owned and operated a chain of seventeen convenience stores in Maryland and Delaware, filed for bankruptcy. Under a reorganization plan approved by the Bankruptcy Court, Shore Stop began operating the Banks convenience stores in 1982 and acquired Banks Dairy Markets, Inc. in 1983. As of December 31, 1984, Shore Stop owned and operated thirty-three convenience stores on the Delmarva Peninsula. Most of these stores sell gasoline.

### B. Defendants

Defendant, Nehi, is a soft drink bottling company headquartered in Camden, Delaware. The Company owns the exclusive bottling and distribution rights for R.C. Cola, Diet Rite Cola, Orange Crush, and Hires Root Beer in Delaware and Maryland's Eastern Shore. Nehi owns two liquor stores and a chain of sixteen beverage warehouses. Under the name "Super Soda Center", the Company currently operates ten beverage warehouses in Delaware and leases six Super Soda Centers in Maryland. In 1984, Nehi reported approximately $10 million in sales.

After initially selling a limited number of items, like soft drinks and cigarettes, the Company made a dramatic decision in 1973. Defendant, and Nehi's president, Duncan, decided to add gasoline to the Super Soda line of products. At that time, he contacted Kellam about supplying Super Soda's existing locations.

### II. THE ECONOMIC RELATIONSHIP

In 1974, Kellam installed gasoline dispensing equipment at the Super Soda Center in Salisbury, Maryland, and the parties entered into the first gasoline supply contract. Between 1975 and 1982, Nehi and Kellam entered into long-term gasoline contracts for nine more Super Soda Centers. Kellam today supplies ten of the sixteen Super Soda Centers located in Delaware and on the Eastern Shore of Maryland; the Super Soda Centers are Kellam's largest independent customer for gasoline.[2]

The events that set in motion the current litigation can be traced to two moments in time. The first was 1974 when Nehi decided to sell gas at its Super Soda outlets and entered into a contractual relationship with Kellam. The second is 1979 when Kellam decided to integrate forward into the convenience store business. The contracts that

---

**1.** Kellam was originally an Arco distributor but in 1960 purchased Watson Oil Co. which sold Texaco products. Kellam distributed under both names until 1982 when Arco cancelled their contract.

**2.** In 1981, Kellam distributed 4,213,126 gallons of gasoline for resale at the Super Soda Centers. This represents 22.3% of all of Kellam's contract gasoline to third parties.

were formed between the parties form the centerpiece of the current litigation and they represent an evolving relationship between a wholesaler and a retailer. The relationship is complicated by the entry of the wholesaler as a competitor, into the same line of business as the retailer.

Kellam and Nehi jockeyed for position during three periods. First is the period from 1975 to May, 1981 when Kellam and Nehi operated under, for the most part, what were arguably requirements contracts. The second period, from June, 1981 until January, 1984 can be described as a "commissioned" agent system. On January 1, 1984, a third method of distribution, the "metering system" was implemented.

From 1975 until May, 1981, Nehi purchased all of its requirements for several of its stores from Kellam Energy. (Answers to Request Nos. 1–7 of Kellam's First Request for Admissions). Upon delivery of loads of gasoline to each Super Soda Center, Nehi took title to the inventory and had thirty days to pay for the gasoline. (Duncan Dep. at 381).[3] Nehi set the retail price for the gasoline. These contracts can be termed requirements contracts.

Nehi was late in paying Kellam for gasoline, and by April 30, 1981, owed Kellam almost $500,000 for its gasoline deliveries. After some discussion as to how to erase the debt, the parties agreed to switch to a "commissioned agent" sales system—the second phase of the relationship. (Polk Kellam Aff. ¶ 13). Under this arrangement, Kellam owned the inventory in the ground and sold directly to consumers; Nehi acted as a sales agent for Kellam and received a commission on each gallon of gasoline sold. (Duncan Dep. at 410). Kellam sold directly to consumers and it established the retail price of the gasoline. (Polk Kellam Aff. ¶ 14). Nehi was free to

vary the posted price to the extent of its commission, and occassionally Nehi charged less than the retail price initially posted by Kellam. (Duncan Dep. at 459–461). Duncan agreed to the new system, perhaps because oil prices rose rapidly in 1981 after decontrol, and it became expensive for Super Soda to own its own inventory. (Duncan Dep. at 410; Lord Dep. at 124). The commissioned agent system began in June, 1981 and continued until January 1, 1984.[4]

In January 1984, the relationship between Nehi and Kellam entered a third stage. The parties, at Duncan's insistence, began to operate under a "metering" system. (Duncan Dep. at 509). Under this arrangement, Kellam owns the inventory in the ground, and sells the gasoline to Nehi as it flows through the dispensing equipment into the consumer's vehicle. Because Nehi makes the sale to the consumer, that company sets the retail price of the gasoline. (Duncan Dep. at 447, 449). Since the inception of the "metering" system, Kellam never suggested what retail price Nehi should charge for its gasoline. (Duncan Dep. at 450).

Nehi used the "metering" system to divert retail trade away from Kellam's gasoline to the Super Soda unbranded pumps. Nehi set the price of Kellam gasoline at six to seven cents above cost (Duncan Dep. at 472), whereas a lower margin is ordinarily added to the unbranded gasoline. (Duncan Dep. at 473–4).

The heart of the allegations made in Nehi's amended counterclaim is that the retail gas prices posted at Super Soda Centers were not as low as the prices charged at other outlets which were in no way affiliated with Kellam. Nehi claims that its gasoline volume was drastically reduced, and it lost sales inside of its conve-

---

3. The Court will employ certain abbreviations. "Dep." will be used for Deposition; "Aff." for Affidavits; and "Ex." for Exhibits that correspond to the Depositions.

4. In April, 1982, defendant Duncan complained that the prices posted by Kellam were not sufficiently low to compete with other retail gasoline outlets. (Duncan Dep. at 405, 690, 692). Duncan also complained that the gasoline price

posted at a Shore Stop in Milford, Delaware was lower than the retail price charged at a nearby Super Soda Center. (Duncan Dep. at 471). Rather than return to the initial distribution system, Nehi installed additional dispensing equipment at seven of the ten locations under contract with Kellam and began selling unbranded gasoline purchased on the spot market.

nience stores as a result. Nehi's troubles were Kellam's profits. Nehi's assertion is that Kellam intentionally priced its gasoline at high levels in order to facilitate the expansion of its Shore Stop convenience chain into Maryland and Delaware. Kellam, according to Nehi, tried to price its dealers out of existence in order to achieve monopoly power in a market defined as convenience stores that sell gasoline.

## III. THE SEVEN CONTRACTS AT ISSUE

While Nehi's counterclaim focuses on the competitive relationship between the parties, Kellam's claim emphasizes their contractual dealings. Plaintiff's complaint put at issue seven Kellam-Nehi contracts executed between May 1, 1975 and May 28, 1982. The gravaman of the complaint is that under these requirements contracts, Nehi breached its obligation to purchase all of its gasoline from Kellam. Nehi's defense, however, is that six of the agreements violated petroleum price regulations instituted by the federal government in 1974. The regulations proscribed certain changes in the business relationship between wholesalers and retailers; these regulations were in effect from 1974 until repealed by President Reagan in 1981.[5]

Three provisions are important to this Motion. The first provision concerns the length of the contract agreement itself. The second provision involves a prohibition Kellam imposed on Nehi that forbade Nehi from installing additional gasoline dispensing equipment and sell another supplier's gasoline. The third provision is Kellam's option to have Nehi purchase the gasoline dispensing equipment upon the termination of the contract. At least one of these three provisions was in each of the six contracts executed between Kellam and Nehi during the relevant period.[6]

Nehi claims that all of these changes violate the federally imposed petroleum regulations because they represented major changes in the manner in which Kellam conducted its business and were made during a period when such changes were prohibited. There is evidence in the record that the six contracts signed by Kellam with the Super Soda outlets differed from prior practice. For example, the four agreements entered into most immediately prior to May 15, 1973, were all for the shorter five year term. (Ap. at A1–A10).

But there is also evidence that Kellam did not change its business practice in disregard of the petroleum regulations. When the Arab oil embargo and concomitant price/allocation regulations occurred in 1973 and 1974, Kellam's expansion into self-service was still in its infancy. As gasoline prices propelled customers to the self-service pumps, the retail outlets serviced by Kellam began to demand more elaborate installations. (Lucius Kellam, Jr. Aff. ¶ 8). Kellam responded by altering its standard form contract in 1976.[7] This con-

---

**5.** The requirements provisions were contained in only three of the Nehi-Kellam contracts. *See supra* notes 5–7.

**6.** The six contracts contained the following provisions:

(1) May 1, 1975 contract for Smyrna, Delaware: 15 year term;

(2) July 1, 1975 contract for Camden, Delaware: 15 year term;

(3) May 5, 1975 contract for Cambridge, Maryland: 15 year term;

(4) September 14, 1977 contract for Seaford, Delaware: 15 year term; exclusive agreement for entire location; purchase of equipment at replacement cost plus the cost of installation;

(5) March 20, 1978 contract for Salisbury Road, Dover: 15 year term; exclusive agreement for entire location; purchase of equip-

ment at replacement cost plus the cost of installation;

(6) March 21, 1979 contract for State Street, Dover: 15 year term; exclusive agreement for entire location; purchase of equipment at replacement cost plus the cost of installation. *See* Ap. at A11–A23.

**7.** The old 1960 Contract form did not specify any quantity of gasoline to be delivered:

2. SALE AND DELIVERY. BUYER shall buy from SHORE and SHORE shall sell and deliver to BUYER for sale from said equipment, _____ gallons of motor fuel annually;

Nor did Kellam's printed form specify the period of time for which it would run. Kellam contends that the durational term was intentionally left blank because no two installations were the same. Where Kellam was to make a "top-of-the-line" equipment investment, Kellam always

tract, however, merely formalized existing supply contracts and incorporated language from earlier contract.[8]

Of the six contracts subject to summary judgment, three were executed using the old contract form and three using the new contract form. Besides these six contracts, the parties entered into four more agreements with a total of ten Super Soda outlets. From the date each contract was signed until 1983, Nehi purchased from Kellam all of the gasoline sold at the ten locations with Kellam-owned equipment. (Answers to Requests Nos. 1–7 of Kellam's First Request for Admissions). Nehi's purchase of gas from other dealers in 1984 started the current controversy.

## IV. THE LITIGATION

The opening volley in this protracted conflict was launched October 9, 1984, when Kellam filed a complaint alleging that Nehi had breached seven requirements contracts that call for Kellam to supply Nehi's Super Soda stores with gasoline. What began as a minor skirmish escalated when Nehi filed a counterclaim on November 21, 1984, alleging not only that Kellam breached the contracts in question, but that Kellam was guilty of antitrust and common law Unfair Competition violations. Since then, pitched battles have escalated into a bitter general conflagration.[9]

The battle has now reached a turning point. On March 20, 1987, defendants filed a Motion for Partial Summary Judgment on the breach of contract claims brought

insisted on long-term contracts. (Ap. at A36; contract with McGinnis Delicatessen). Less costly installations merited shorter contract terms. (Ap. at A7).

The final contract term concerns the disposition of the equipment installation upon termination of the agreement. Kellam's representatives left blank lines in the contract regarding what price would be paid by a retailer for gas tanks at the end of the contract period. The provision reads:

> Upon cancellation by SHORE for any breach and exercise by SHORE of its rights to remove equipment BUYER shall pay to SHORE the sum of ____ Dollars ($____) as reimbursement for the agreed upon cost of installation and removal of the equipment and improvement, or, at its option, SHORE may leave the equipment in place and upon demand BUYER shall pay the sum of ____ Dollars ($____) the agreed upon value of the equipment and improvements and upon payment title thereto shall pass to BUYER.

A 1960's contract form was used for the Super Sodas at Smyrna, Camden and Cambridge, Maryland. All these contracts and arrangements were reviewed by the Federal Energy Administration as part of a routine compliance audit in 1975. The Agency determined that Kellam's gasoline operations were in compliance with the Emergency Petroleum Allocation Act and regulations promulgated thereunder. (Polk Kellam Aff. ¶ 4).

**8.** A different set of contracts was used by Kellam for the Super Sodas in Seaford, Salisbury Road and State Street. They derived from a 1976 contract form that Kellam adopted after changing its name from Shore Atlantic, Inc. (Polk Kellam Aff. ¶ 6). According to Kellam, the contract memorialized Kellam's longstanding practice. The length of the contract was

again left blank on the contract form, but the 1976 contract explicitly stated that Kellam reserved the right to have Super Sodas purchase the dispensing equipment "at the then current price for similar equipment." Kellam understood this to mean the market value of tanks of the same age and in the same condition as those being sold. (Kellam Aff. ¶ 7; App. at A18). The Contract reads:

> Any equipment attached to the realty, such as underground equipment, shall, if Kellam so desires, be purchased by Buyer from Kellam at the then current price for similar equipment, taking into consideration the cost of installing such equipment.

The contract also specifically stated that the buyer agrees to purchase from Kellam all of buyer's requirements. The 1976 contract form stated:

> 2. Kellam agrees to sell to Buyer and Buyer agrees to purchase from Kellam all of Buyer's entire supply of gasoline and diesel fuel which Buyer dispenses at the above described location.

In the late 1970's, the Department of Energy, the successor to the Federal Energy Administration, also reviewed these particular Kellam contracts and decided that they complied with federal price regulations. (Kellam Aff. ¶ 5).

**9.** This litigation is lengthy: it is almost three years old and the parties are just now completing discovery. It is voluminous: the parties exchanged almost 62,000 documents. And it is complex: the parties deposed 47 witnesses, generating approximately 7,200 pages of transcript. *See, Kellam Energy, Inc. v. Duncan,* 616 F.Supp. 215 (D.Del.1985). *See also, Kellam Energy, Inc. v. Duncan,* slip op. No. 84–479–CMW (D.Del. Dec. 9, 1986) [Available on WESTLAW, DCT database].

by plaintiff. On March 23, 1987, plaintiff filed a Motion for Summary Judgment on all of defendants' counterclaims. After hearing oral argument on April 21, 1987, the Cross-Motions for Summary Judgment are now before the Court.

DISCUSSION

I. SUMMARY JUDGMENT IN COMPLEX LITIGATION

Before the recent Supreme Court trilogy in *Matsushita Electric Industrial Co. v. Zenith Radio Corp.*, 475 U.S. 574, 106 S.Ct. 1348, 89 L.Ed.2d 538 (1986); *Celotex Corp. v. Catrett*, 477 U.S. 317, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986), and *Anderson v. Liberty Lobby*, 477 U.S. 242, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986), summary judgment was the object of judicial hostility and disdain. *See, e.g., Bushman v. Halm*, 798 F.2d 651 (3d Cir., 1986) (summary judgment is a drastic remedy that prevents a claimant from presenting his cause of action to a jury of his peers).[10]

■ *Adickes v. S.H. Kress & Co.*, 398 U.S. 144, 90 S.Ct. 1598, 26 L.Ed.2d 142 (1970), was still the Court's leading exposition of the standard to be applied by District Courts when ruling on summary judgment motions. In *Adickes*, the Court held that on a motion for summary judgment, the evidence must be viewed in the light most favorable to the non-moving party. If the evidence were capable of supporting the interpretation advanced by the non-moving party, then summary judgment must be denied. *Id.;* Fed.R.Civ.P. 56(e); *T.A.M., Inc. v. Gulf Oil Corp.*, 553 F.Supp. 499, 502 (E.D.Pa.1982).

In *Matsushita*, the Supreme Court modified the summary judgment standard previously applied to antitrust cases. The Court concluded that "where the record taken as a whole could not lead a rational trier of fact to find for the non-moving party, there is no genuine issue for trial." 106 S.Ct. at 1356. The Court held that when a moving party had satisfied its burden under Rule 56(c), the non-moving party opponent must do more than simply show that there is some metaphysical doubt as to the existence of a dispute of material fact. Rather, the non-moving party must come forward with specific facts showing that there is a genuine issue for trial.

Using these principles, the Court stated that if in a given factual context the non-moving party's claim is "implausible—if the claim is one that simply makes no economic sense," then the non-moving party's burden to come forward with persuasive evidence to support its claim is greater than what would otherwise be necessary. *Id.* Where economic factors strongly suggest that a defendant in an antitrust action would have no motive to join a conspiracy or would otherwise not gain by engaging in the activities alleged, then the plaintiffs' burden to come forward with specific facts that the defendants in fact participated in the alleged illegal activity is heightened.[11]

*Matsushita* applies to antitrust cases where a conspiracy is alleged—such as defendants' price fixing counterclaim in the instant action. (Amended Counterclaim ¶¶ 51–57). *Matsushita* and the two other cases in the trilogy "transformed the law governing motions for summary judgment." Vanyo and Scott, "The Benefit of the Burden", *Current Problems In Federal Civil Practice* 175 (1986).[12]

---

**10.** Before *Matsushita*, the common wisdom was that summary judgment was particularly inappropriate in complex civil litigations, especially antitrust actions. *See Poller v. Columbia Broadcasting Co.*, 368 U.S. 464, 82 S.Ct. 486, 7 L.Ed.2d 458 (1962). ("We believe that summary procedures should be used sparingly in complex antitrust litigations were motive and intent play leading roles, the proof is largely in the hands of the alleged conspirators, and hostile witnesses thicken the plot."). 368 U.S. at 473, 82 S.Ct. at 491.

**11.** *Matsushita* shifts the burden to the non-moving party to come forward with evidence to permit a trier of fact to find that the defendants conspired to violate the antitrust laws. Absent the existence of sufficient unambiguous evidence of the conspiracy, summary judgment is mandated. This amounts to an invitation to district courts in appropriate cases to weigh the sufficiency of the evidence presented as well as the plausibility of the underlying theory of the plaintiff's cause of action.

**12.** First, the Court determined that a party moving for summary judgment need not engage every possible basis for the claimant's theory in order to prevail on the motion. *Celotex Corp. v. Catrett*, 477 U.S. 317, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986). Second, the Court equated the stan-

The new summary judgment landscape is easily summarized. The moving party (if a defendant) bears the burden of pointing out the absence of evidence supporting the claimant's theory of recovery. The burden then shifts to the non-moving party to present sufficient evidence to allow a rational jury to find in its favor by the appropriate evidentiary standard. If, however, the claimant's theory is inherently implausible, a greater evidentiary showing is required to meet this burden. The fact that the disputed issues involve questions of motive or intent, the evidence of which is in the hands of defendants, is not sufficient to defeat the motion. The claimant must produce affirmative evidence tending to support its claim; challenges to the moving party's credibility are not sufficient to defeat the motion. The rationale of these decisions dictates that the federal court is to weigh the competing inferences of both parties; only where those inferences favor the plaintiff will the motion be denied.[13]

## II. DEFENDANTS' MOTION FOR PARTIAL SUMMARY JUDGMENT ON THE CONTRACT CLAIM

In moving for partial summary judgment on the breach of contract claims, Nehi maintains that the six contracts with Kellam violated federal petroleum regulations that forbid suppliers from altering their

dards governing summary judgment with those governing directed verdicts, determining that the non-movant bears the burden of coming forward with evidence sufficient to allow a reasonable jury to find in its favor. *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986). Finally, the Court determined that a party asserting an inherently inplausible claim must make an even greater evidentiary showing in order to defeat a motion for summary judgment. *Matsushita.*

13. In complex civil litigation, therefore, the Supreme Court's recent decisions have made summary judgment a powerful new weapon in the hands of defendants. *See Apex Oil Co. v. Di-Mauro,* 641 F.Supp. 1246, 1256 (S.D.N.Y.1986) (the Supreme Court's recent opinions, particularly those in *Monsanto* and *Matsushita,* signal a marked change from the reticence to grant summary judgment of *Poller,* a change spurred, perhaps, by the onslaught of massive antitrust litigation over the last 20 years and the attendant stress on the administration of justice.).

"normal business practices" in effect on May 15, 1973. Three suspect provisions were contained in some or all of the six contracts: (1) the length of the contract—fifteen years; (2) the requirements provision that obligated Nehi to purchase all of its gasoline from Kellam; and (3) the equipment purchase term. The Court finds that Nehi has not met its burden of demonstrating the absence of any material fact as to whether these three contractual provisions in themselves constituted a violation of the petroleum regulations.

### A. *The Regulations and Their Interpretations*

Oil price control regulations were promulgated pursuant to the Economic Stabilization Act of 1970 which was a dramatic presidential initiative designed to cool an overheated and inflationary economy. When the 1973 Arab oil embargo ignited a further inflationary spiral that threatened the domestic economy, Congress enacted the Emergency Petroleum Allocation Act of 1973, 15 U.S.C. § 751 *et seq.* (1976) ("EPAA"). The purpose of the Act was to stem shortages of petroleum products in the face of skyrocketing oil prices. The Act sought to freeze existing supplier/purchaser relationships and price margins as of 1973.[14] All authority vested in the Pres-

14. The Emergency Petroleum Allocation Act of 1973 ("EPAA") (Pub.L. 93–159, 15 U.S.C. § 751 *et seq.*) required the President to regulate the price and allocation of crude oil and petroleum products. The purposes of the EPAA were set forth in § 4(b)(1) of that statute, 15 U.S.C. § 753(b)(1). Among these were:

(D) preservation of an economically sound and competitive petroleum industry: including the priority needs to restore and foster competition ... and to preserve the competitive viability of ... nonbranded independent marketers, and branded independent marketers; [and]....

(F) equitable distribution of ... refined petroleum products at equitable prices among all regions and areas of the United States and sectors of the petroleum industry, including ... nonbranded independent marketers and branded independent marketers....

ident under the EPAA was delegated to the Federal Energy Administration ("FEA").

The FEA issued mandatory petroleum price and allocation regulations imposing ceiling prices on petroleum products and limiting non-petroleum costs that could be passed through to the consumer. The FEA enforced these regulations through comprehensive record keeping and administrative audits.

The regulations at issue require that "suppliers will deal with purchasers of an allocated product according to normal business practices in effect during the base period [1972] for that allocated product." [15] 10 C.F.R. 210.62 (1982). Other parts of the regulations then go on to define what constitutes a "normal business practice." Suppliers, for example, may not extend "any preference or sales treatment" which has the effect of frustrating the purposes of the regulations [16]—the purpose being the maintenance of "normal" business practice. The regulations also condemn any practice that imposes a price higher than is "customarily imposed," stating specifically that such practices include "tie-in agreements." [17]

■ The courts interpret the provisions of 10 C.F.R. 210.62 in two important respects. First, a modification of a "normal business practice" would have violated § 210.62(a) only "if the result had constituted a circumvention or frustration of its purposes or other regulations." *McWhirter Distributing Co. v. Texaco, Inc.,* 668 F.2d 511, 523 (Temp.Emer.Ct.App.1981). The purpose of the EPAA was "to prevent

price gouging or price discrimination which might otherwise occur on the basis of current shortages." Conf.Rep. No. 628, 93d Cong., 1st. Sess., *reprinted in* [1973] U.S. Code Cong. & Ad.News 2582, 2688, 2702 (1973). Regulations promulgated under the Act which purport to control more than the price charged for gasoline or the allocation of that product are beyond the scope of the agency authority. *Atlantic Richfield Co. v. Zarb,* 532 F.2d 1363, 1370 (Temp.Emer.Ct.App.1976); *Shell Oil Corp. v. Federal Energy Administration,* 527 F.2d 1243, 1246 (Temp.Emer.Ct.App.1975). Department of Energy rulings on the regulations establish the principle that in order to be actionable, the change in a "normal business practice" must involve either an attempt to get higher gasoline prices or a discrimination in supply.

The case law provides secondly that, in judging what constitutes "normal business practices", the courts should be guided by the conduct of the parties, not simply the contracts signed between the two parties. That the contracts should govern was specifically rejected by a district court interpreting the scope of 10 C.F.R. § 210.62:

Citgo has argued that the only evidence of normal business practices [as defined by 10 C.F.R. 210.62] is the leases themselves, and that the normal business practice is to enter into leases teminable without cause or reason. The Court believes, however, that the actual and practical normal business practices of Citgo must be examined, for if Citgo has customarily not exercised its rights under

---

**15.** 10 C.F.R. 210 62(a) provided that:

Suppliers will deal with purchasers of an allocated product according to normal business practices in effect during the base period specified in Part 211 for that allocated product, and no supplier may modify any normal business practice so as to result in the circumvention of any provision of this chapter.

Part 211 specified calendar year 1972 as the base period for sales of motor gasoline. 10 C.F.R. 211.102 (1978).

**16.** During the same period, § 210.62(b) provided that:

No supplier shall engage in any form of discrimination among purchasers of any allocated product. For purposes of this para-

graph, "discrimination" means extending any preference or sales treatment which has the effect of frustrating or impairing the objective, purposes and intent of this chapter or of the [EPAA]....

**17.** Throughout the relevant period, 10 C.F.R. 210.62(c) provided that:

"[a]ny practice which constitutes a means to obtain a price higher than is permitted by the regulations in this chapter or to impose terms or conditions not customarily imposed upon the sale of an allocated product is a violation of these regulations. Such practices include, but are not limited to ... tie-in agreements...."

service station leases, then that may constitute the normal business practice. *Guyer v. Cities Service Co.*, 381 F.Supp. 7, 13 (E.D.Wis.1974). In the case at bar, all the evidence taken together suggests that there is a material issue of fact as to whether Kellam pursued its normal business practice.

### B. *Changed Business Practices*

Nehi does not assert that Kellam actually charged Nehi higher prices for gasoline than allowed by regulation. This Nehi could not do because the Department of Energy audited Kellam regularly and found no violations. (Polk Kellam Aff. ¶ 4). Instead, defendants assert that during the regulatory period, Kellam changed three business practices in violation of 10 C.F.R. 210.62. These will be considered *seriatim*.

### 1. *The Contracts' Length*

■ Nehi claims that Kellam violated the regulations because the six contracts all contained fifteen year terms—these terms are longer than the contracts Kellam entered into during 1972 with other retailers. (Defendants' Opening Brief at 20–21). But defendants cite no case to suggest that merely increasing the length of the contract constitutes a violation of the applicable regulations. If anything, common sense dictates that a longer term contract is in keeping with the spirit of the regulations which was to freeze the relationship between suppliers and retailers and ensure that retailers were assured an adequate supply of gasoline.

Simply changing the length of a contract does not necessarily constitute a deviation from normal business practices. There is evidence on the record that rebuts Nehi's contentions about what the normal length of Kellam's supply contracts. Kellam always assessed each potential installation on its own merits, taking into account the size of the equipment investment, the likelihood that the retail outlet would stay in business and the estimated volume of gas-

oline. (Lucius Kellam Aff. ¶ 9). The requirements language had no effect on the price Kellam charged Nehi for gasoline. These prices were subject to the price regulations and could only be increased in accordance with the cost based formula contained in the regulations. Nor did the exclusive dealing provision in any way permit Kellam to restrict the amount of gas that it was obligated to sell to Nehi. *See Shell Oil*, 527 F.2d at 1246.

Where Kellam was to make a "top-of-the-line" equipment investment, the company always insisted upon a long term contract, whether of ten or of fifteen years. Contracts of long length are required if the company is to assume the risk of making a substantial investment in purchasing and installing underground tanks and equipment. Kellam has contracts of many different lengths.[18]

Kellam preferred a fifteen year contract for the Super Soda Centers because the locations involved were of questionable economic viability and the investments were considered unusually risky. (Lucius Kellam Aff. ¶ 10). The investment was particularly risky because Kellam installed, at Nehi's insistence, top-of-the-line equipment. Although Kellam did not want to make these investments because they were considered too much of a cash outlay, Kellam went ahead anyway. (Floyd Dep. at 477). Because Duncan wanted a top-of-the-line investment at a questionable location, Lucius Kellam decided that a long-term contract of fifteen years was necessary for Kellam to undertake the risk. (Lucius Kellam Aff. ¶ 10). Duncan never objected to a fifteen year term. (Kellam Aff. ¶¶ 10 and 11). Finally, because top-of-the-line gas installations were increasing rapidly in price, Kellam felt that it needed additional years in its long-term contracts to recoup the increased costs. (Lucius Kellam Aff. ¶¶ 8 and 9).

Under the reasoning of *Guyer*, 381 F.Supp. at 13, the court may look beyond

---

**18.** *See, e.g.,* Bodenweiser Contract (Selbyville) dated August 11, 1977 (12.5 years); M/M Becker Contract (R & I Market) dated March 23, 1977 (10 years); Elwood Young Contract (Young's) dated April 1, 1977 (5 years). *See* Ap. at A1–A30.

the language of the contract to determine what is a normal business practice for purposes of 10 C.F.R. 210.62. Use of a fifteen year term rather than a ten year term is not an alteration of a business practice that would have violated 10 C.F.R. 210.62. If anything, the increase in contract length to fifteen years was a benefit to Nehi because gasoline was in short supply during that period and the contract guaranteed defendants a steady source of supply. (Lucius Kellam, Jr. Aff. ¶ 10).

### 2. *The Requirements Provision*

■ Nehi also suggests that the provisions in six of the contracts requiring Nehi to purchase all of its gasoline from Kellam was a change in a normal business practice.[19]

Nehi alleges that it was not a normal Kellam practice during the base period of 1972 to require retailers to purchase all of their gasoline from Kellam. To prove this proposition, Nehi relies on the language of the contract. But there is ample evidence in the record to suggest that Kellam's normal business practice prior to 1972, and afterward, was to require the dealers to whom it provided gasoline dispensing equipment free of charge to purchase from Kellam all gasoline sold at the location under contract. Defendant Duncan's own testimony establishes that he understood his contractual obligation was to purchase all gasoline sold at the first Super Soda Center in Salisbury from Kellam. (Duncan Dep. at 377). Duncan further acknowledges that he believed all terms and conditions of the subsequent contracts to be the same as the intial one. (Duncan Dep. at 399–400). Floyd confirmed Duncan's testimony by acknowledging that he told Duncan that Nehi would be obligated to purchase all gasoline sold at this Super Soda Center from Kellam. Duncan specifically agreed to this condition. (Floyd Dep. at

512–13). Kellam representatives made it a practice of informing retailers with whom the company contracted that they were entering into a requirements arrangement. (Lucius Kellam Aff. ¶ 7).

The regulation prohibiting changes in the gasoline suppliers' "normal business practices" applies to the practices that the supplier actually employed during the base period, not what its contracts state. *Guyer*, 381 F.Supp. at 13. The 1976 change in Kellam's contract form, therefore, did not violate 10 C.F.R. 210.62 because it did not alter Kellam's established practice of treating its gasoline supply contracts as requirements arrangements.

### 3. *The Equipment Purchase Term*

■ To prove a violation of the petroleum price regulations, Nehi claims that "Kellam changed the price of the equipment to be purchased under the contract option from one based on depreciated value to one based on replacement cost, plus the cost of installation." (Opening brief at 6–7).[20]

The flaw in this argument is that the operative contract term does not speak of replacement costs. The contract states:

> Any equipment attached to the realty, such as underground equipment, shall, if Kellam so desires, be purchased by Buyer from Kellam at the then current price for similar equipment, taking into consideration the cost of installing such equipment....

Arguably, the phrase "at the then current price for *similar* equipment" means the market value of tanks of the same age and in the same condition—not replacement cost. (Polk Kellam Affidavit ¶ 17). Defendants have not established that Kellam changed its business practice from one in which equipment could be repurchased at depreciated cost to one based on full replacement cost for new equipment.[21]

---

**19.** The requirements provisions were contained in only three of the Nehi-Kellam contracts. *See supra* notes 5–7.

**20.** The purported violation regarding the equipment purchase term of the contracts applies only to one Super Soda Center at Seaford and to

two Super Soda Centers at Dover. *See supra* notes 6–7.

**21.** Defendants have the burden of establishing Kellam's normal business practices prior to May 15, 1973. *Gulf Oil*, 553 F.Supp. 499, 510 (E.D. Pa.1982). The record, however, contains no evi-

For the foregoing reasons, Defendants Motion for Partial Summary Judgment on the six contracts claims is denied. The plaintiff's breach of contract action as to all contracts at issue between the parties survives and will be heard at trial.[22]

## III. PLAINTIFF'S MOTION FOR SUMMARY JUDGMENT ON THE BREACH OF CONTRACT; THE COMMON LAW UNFAIR COMPETITION; AND THE ANTI-TRUST COUNTERCLAIMS

### A. The Contract Counterclaim

Count I of Nehi's Amended Counterclaim alleges that Kellam breached the seven requirements contracts between the parties. Three different breaches are alleged: (1) Kellam breached an implied contractual obligation not to compete with Nehi; (2) Kellam breached an alleged oral agreement to keep Nehi "competitive" which Nehi interpreted to mean that Nehi would be charged prices as low or lower than those received by any other retail gasoline outlet; and (3) Kellam breached the written pricing terms of the requirements contracts. Summary Judgment is denied on the last two alleged breaches.

### 1. The Covenant Not to Compete

■ Although not clear from the Amended Counterclaim or from the briefs, the Court believes that Nehi's position is that somehow the Court should read into the Nehi-Kellam contracts an implied covenant that Kellam will not, through its Shore Stop Outlets, compete with Nehi. A contractual term, however, is not lightly implied, and will only be inserted if the drafters would have directed their attention to it. Gould v. American Hawaiian Steamship Co., 331 F.Supp. 981, 990 (D.Del.1971). See also Danby v. Osteopathic Hospital As'n., 101 A.2d 308, 313 (Del.Ch.1953) ("A

promise will not be read into a contract unless it arises by necessary implication from the provisions thereof.").

■ A covenant not to compete is perhaps the most disfavored in the law because its effect "is to create a limited geographic monopoly. As such, it is a restraint on trade and will be enforced by the court only if the covenant is positively expressed. Even then, it will be narrowly construed." Howard D. Johnson Co. v. Parkside Development Corp., 169 Ind. App. 379, 348 N.E.2d 656, 660 (1976). See also C. Pappas Co., Inc. v. E.J. Gallo Winery, 610 F.Supp. 662, 667 (E.D.Cal. 1985), aff'd., 801 F.2d 399 (9th Cir.1986).

Delaware courts rarely recognize covenants not to compete. In Rogers v. Jones, 150 A.2d 327 (Del.Ch.1959), a landlord sought to enjoin one of its tenants from opening a business identical to the one the tenant operated on the landlord's property. The court dismissed the suit, stating: "admittedly, there is no provision in the lease prohibiting defendant from opening up a business similar to that which was leased to defendant. Such restraints are not readily implied." Id. at 328. See also Galluci v. Shue, 182 A.2d 656 (Del.Ch.1962); Dickey v. Holiday Inns of America, Inc., 226 So.2d 406 (Fla.App.1969) (the court would not imply a covenant not to compete between a Holiday Inn, as a franchisor, and one of its franchisees).

■ There is no evidence on the record that either Nehi or Duncan or Kellam had any intention of arranging a covenant not to compete. Nehi has the burden of proving that both parties intended such a covenant and would have assented to the provision had it come up. See Martin v. Star Publishing Co., 126 A.2d 238, 244 (Del.Sup. Ct.1956). Nehi offers no cases to support its theory of an implied covenant not to

---

dence concerning the terms and conditions upon which Kellam actually sold tanks and dispensing equipment during this period. Defendants only "evidence" consists of a series of contracts with blank price terms. This cannot carry defendants' burden of proof.

**22.** The Court need not consider other arguments raised by plaintiff such as the question of whether the defendants' affirmative defense of illegality of contract is barred by the statute of limitations or whether, if the contracts were declared in violation of the regulations, they were revived when the petroleum regulations were lifted in 1981.

compete. The one case it cites, *Antoine v. F.J. Boutell Driveaway Co., Inc.*, 351 F.Supp. 1271 (D.Del.1972) spoke only of covenants generally in the context of a fact pattern involvng an implied covenant of reasonable use. *Id.* at 1275. In concluding that a court generally may imply such a covenant—without addressing the more rigorous standard for implication of a covenant not to compete—the court held that a covenant could be found "in the light of the surrounding circumstances." *Id.* Even if this were regarded as the law, there is nothing in the record to suggest that the parties intended by the surrounding circumstances not to compete.

Accordingly, the Motion for Summary Judgment on the contract counterclaim regarding a covenant not to compete is granted.

### 2. *The Oral Contract Modification*

In its Amended Counterclaim, Nehi contends that Kellam breached the contracts between the two parties because Kellam made an oral agreement to keep Nehi "competitive" which Nehi interpreted to mean that Nehi would be charged prices as low or lower than those received by any other retail gasoline outlet. Nehi claims that Kellam breached this agreement.

This problem of interpretation arises because the term of the contract regarding what price Kellam will charge Nehi for the gasoline it delivers is ambiguous. The contracts for the seven Super Soda Stores leave open the price terms, stating only that Kellam will provide gas to Nehi at the same price as that provided to other Kellam buyers "in the same classification" as Nehi at the time and place of delivery.[23]

During the negotiations proceeding the signing of the contracts for the Salisbury Super Soda Center, Allen Floyd and Lucius Kellam, Jr., officers of Kellam, promised to keep Duncan and Nehi "competitive." (Duncan Dep. at 371). Duncan interpreted that statement to mean that Nehi would be charged gasoline prices as low or lower than those charged on the spot market by any other supplier, regardless of Kellam's cost of product. (Duncan Dep., at 372). Nehi contends that Kellam breached this oral pricing agreement because, since April, 1982, other gasoline retailers have had lower street prices than those posted at the Super Soda Centers. (Duncan Dep. at 475, 478; Amended Counterclaim ¶ 41(b)(iv)).

All seven contracts signed by the parties state explicitly that the contracts constitute the "entire" understanding or agreement between the parties. (Ap. at A13–A24). Ordinarily, the parol evidence rule should bar evidence which would vary or alter the written terms of a contract. *See* 6 *Del.C.* § 2–202. Nehi counters, however, that parol evidence should be allowed because the pricing terms of the contracts are left open and must be supplemented pursuant to the open price provisions of the Uniform Commercial Code as set forth in 6 *Del.C.* § 2–305.

But not every contract which does not specify an exact price is subject to modification under § 2–305. When the contracts stipulate that the price will be set according to a particular standard, Section 2–305 has no role to play and parol evidence will be excluded. In *T.A.M., Inc. v. Gulf Oil Corp.*, 553 F.Supp. 499, 509 (E.D. Pa.1982), Judge Pollack crafted an exception that specifically excludes parol evidence when two commercial parties contract, with an open price term, in good faith. Pollack's exception concerns precisely the type of petroleum contracts at issue in this litigation. His reasoning was that

---

**23.** The gasoline requirements contracts for the Smyrna, Camden and Cambridge Super Soda Centers contain the following pricing term:

> 3. PRICE AND TERMS. BUYER shall pay for all products delivered hereunder the price established from time to time by SHORE for buyers in the same classification as BUYER in effect at the time and place of delivery to BUYER....

The contracts for the Seaford, Dover # 1, Dover # 2 and Milford Super Soda Centers similarly state:

> 3. Buyer shall pay for all products delivered hereunder the price established from time to time by Kellam for buyers in the same classification as Buyer in effect at the time and place of delivery to Buyer.

subsection 2 of Section 2–305 of the U.C.C. allows for two parties to a contract to agree that a price be fixed by the seller in good faith. *Id.* at 509. The contracts at issue here are such agreements. They allow the seller, Kellam, to supply Nehi with gasoline at a price established by Kellam from time to time "for buyers in the same classification" as Nehi. This provision is almost exactly identical to the petroleum sales contract in *Gulf Oil* where the contract stipulated that the seller deliver at the "seller's price in effect at the time and for the place of delivery." *Id.* at 509.

 But even though this case is quite similar to *Gulf Oil,* there is one critical difference which will allow the Court to consider parol evidence. In *dicta* in *Gulf Oil,* Judge Pollack noted that "the plaintiffs have not alleged that the prices they were asked to pay differed from those demanded of other Gulf dealers...." *Id.* at 509. Pollack suggested that if a plaintiff alleged that it was charged prices higher than those asked of other retailers, this may indicate bad faith, and the court may consider parol evidence on the question of the open term of the contract. *Id.*

Here, unlike in *Gulf Oil,* Nehi specifically alleges that the prices they were asked to pay differed from the prices that Kellam demanded of other convenience store operators. (Amended Counterclaim ¶ 46 and ¶¶ 41(b)(iv) and 41(c)). Moreover, there is evidence on the record that Kellam gave rebates to other convenience stores, once the commission sales system was in place, effectively offering lower price terms to retailers other than Nehi. (Floyd Dep. at 90–93; Floyd Exhs. 4, 5, 12, 18). There is no evidence here, as there was in *Gulf Oil,* that the retailers acceded to open price

terms that favored third parties. *Gulf Oil* at 509–510. Duncan complained almost immediately of the system, and began to install other equipment. (Duncan Dep. at 475, 478).

The Court will employ U.C.C. section 2–305, the so called "gap filler" provision, to hold that because the contracts lack specific price terms, they are not a complete statement of the parties' respective rights and duties. Therefore, the Court will reform the contract under 6 *Del.C.* § 2–305 and will allow the parties to present parol evidence about what the open price term of the contract means. Specifically, the trier of fact will have to determine whether Kellam had a contractual obligation to guarantee Nehi lower gasoline prices than any other retail outlet in Nehi's market area.[24] This, in turn, will hinge on a factual determination as to what Kellam meant when it promised to keep Nehi "competitive."[25]

### 3. *The Written Contract Terms*

 Nehi also contends that Kellam breached the written terms of paragraph three of the contracts between the two parties. This paragraph is an open price term that obligates Kellam to sell to Nehi petroleum at "the price established from time to time by [Kellam] for buyers in the same classification as [Nehi] in effect at the time and place of delivery to [Nehi]." This question is purely one of fact as to whether Nehi received the same price terms as other dealers in the same classification. This is a different question from that posed by consideration of the written contract as modified by Kellam's promise to keep Nehi competitive. Here, the trier of fact may find that Kellam breached its contract if Kellam sold petroleum to Nehi

---

**24.** Nehi's discussion of *TCP Industries, Inc. v. Uniroyal, Inc.,* 661 F.2d 542 (6th Cir.1981) is inapposite because that case did not concern an open contract term. Rather, that case dealt with a contractual provision that was fiercely negotiated. *Id.* at 548. It was entirely different than the contract in the case at bar which, Nehi maintains, was not even read before it was signed.

**25.** In denying Kellam's Motion for Summary Judgment on Nehi's breach of contract counter-

claim, the Court need not weigh Nehi's other arguments as to why the contract counterclaim should survive. The trier of fact need not consider the other theories advanced in support of Nehi's motion: (1) that the promise to keep Nehi competitive constituted a separate and enforceable "oral agreement"; (2) that Nehi detrimentally relied on Kellam's promise; or (3) that there was an implied covenent that obligated Kellam to provide Nehi with the lowest prices in the market.

at a higher price than that offered in only *one* convenience store in the relevant market.

To prove a breach of the written contract, however, Nehi must demonstrate that Kellam charged Nehi a higher price than it charged buyers in the same classification as Nehi. Although this is a more elaborate inquiry, Nehi has produced some evidence that buyers in the same classification received a lower price than Nehi did. For example, the record contains evidence that Kellam offered price rebates and commission discounts to other convenience stores. (Floyd Dep. at 90–93; Floyd Exs. 4, 5, 12, 18). There is sufficient evidence in the record such that the Court cannot grant summary judgment on the contract claims.

The Court will grant summary judgment on the Contract Counterclaim insofar as it suggests that Kellam breached an implied covenant not to compete. But the Court denies summary judgment on the Contract Counterclaim as a whole, and will allow Nehi to prove at trial that Kellam either breached the written terms of the contract or breached an oral modification thereto.

### B. *The Unfair Competition Counterclaim*

Count II of the Amended Counterclaim alleges that Kellam engaged in "Unfair Competition" with Nehi. (Amended Counterclaim ¶ 48). This Count fails to state a claim because the actions complained of by defendants are outside the scope of Delaware's Unfair Competition Law.

Unfair Competition is "a convenient name for the doctrine that no one should be allowed to sell his goods as those of another." *William A. Rogers, Ltd. v. Majestic Products Corp.*, 23 F.2d 219, 220 (D.Del. 1927). This tort was recognized at common law in Delaware until 1965 when the Delaware General Assembly enacted the Deceptive Trade Practices Act, 6 *Del.C.* §§ 2251 to 2536. This statute codified the common law of Unfair Competition. *Young v. Joyce*, 351 A.2d 857, 859 (Del.Sup.Ct.1975);

*Griffith v. Brown P. Thawley, Inc.*, slip op. No. 81C–Mr–9 (Del.Super.Ct.1983). Section Two of the statute prohibits twelve specifically enumerated trade practices. To the extent Nehi's counterclaim states an allegation based on this statute, it must be dismissed because Nehi signed a stipulation to the effect that none of these practices is at issue in the instant litigation. (Duncan Dep. at 677).

Nehi counters that their Unfair Competition count is a common law action that survives the statute. They point to language contained in another part of the Deceptive Trade Practices Statute: "(c) This section does not affect trade practices otherwise actionable at common law or under other statutes of this State." 6 *Del.C.*

But Nehi has failed to cite a case suggesting that the common law tort of Unfair Competition survived the statute. And even if Nehi did, the Court does not have to reach that question. Instead, the Court finds that Nehi has not alleged or offered proof of any set of facts that could make out a claim for Unfair Competition. Although the tort of "Unfair Competition" encompasses many practices, at common law these practices were limited. At least one court squarely holds that common-law Unfair Competition must be grounded in either deception or appropriation of the exclusive property of the plaintiff. *Societe Comptoir De L'Industrie Cotonniere Etablissements Boussac v. Alexander's Dep't. Stores, Inc.*, 299 F.2d 33 (2d Cir.1962). False marketing, appropriation of ideas, purloining of trade secrets, commercial bribery, intimidation, and harrassment all comprised Unfair Competition at common law. J.O. vanKalinowski, 1 Anti-trust Laws And Trade Regulation, § 1.03[3] (1986). *See also Lumley v. Gye*, 118 Eng. Rep. 749 (1853); *Bowen v. Hall*, 6 Q.B.D. 333 (1881). *But see* Prosser, Torts 981 (3d ed. 1964).

None of these violations were alleged, nor are there any facts on the record to prove them.[26]

---

**26.** Nehi might have alleged the common law tort of restraint of trade. *See* vonKalinowski

§ 1.03[4]. Such a common law cause of action encompasses practices like Resale Price Mainte-

Summary judgment is granted on defendants' Unfair Competition counterclaim.

## C. *The Antitrust Counterclaims*

### 1. *Tying*

■ Count IV of the Amended Counterclaim alleges that the requirements contracts constitute illegal tying arrangements. A tying arrangement is one in which the availability of one item (the "tying" item) is conditioned upon purchase or rental of another item (the "tied" item). Like other agreements in restraint of trade, these arrangements may be subject to antitrust scrutiny under the broad Sherman Act rule of reason.

Nehi asserts that it was forced to accept Kellam owned dispensing equipment in order to purchase Kellam's gasoline. (Amended Counterclaim, ¶ 60). Gasoline dispensing equipment is alleged to be the "tied" or "forced" product. (Fenili Dep. at 143–44; Lane Dep. at 279). Wholesale gasoline is asserted to be the "tying" or "dominant product". (Fenili Dep. at 143; Lane Dep. at 278). Nehi contends that the alleged tying arrangements violate Section 3 of the Clayton Act [27] and Section 1 of the Sherman Act.[28] (Amended Counterclaim, ¶ 61).

Tying restrictions are generally challenged using a rule of presumptive illegality fashioned under the Sherman Act Section 1 and the Clayton Act Section 3.

While the rule is one of presumed illegality, it is commonly—and misleadingly—referred to as the "per se" tying standard. The per se test was recently reaffirmed by the Supreme Court in *Jefferson Parish Hospital District No. 2 v. Hyde*, 466 U.S. 2, 104 S.Ct. 1551, 80 L.Ed.2d 2 (1984) (four justices would have supplanted the per se analysis with a rule of reason standard).

■ The per se standard requires proof of four elements: (1) that the purportedly tied and tying items entail "separate product markets"; (2) that the availability of the tying item has been "conditioned" upon purchase or rental of the tied item; (3) that the party imposing the tie has sufficient "economic power" in the tying product market (gas) to "appreciably restrain free competition" in the tied market (gas pumps); and (4) that a "not insubstantial" amount of commerce in the tied item is affected by the arrangement. *See Jefferson Parrish, id.; United States Steel Corp. v. Fortner Enterprise, Inc.*, 429 U.S. 610, 617–19, 97 S.Ct. 861, 866–67, 51 L.Ed.2d 80 (1977). Even assuming that all four elements are met, the defendants may still justify the restriction by proving its overall competitive reasonableness; hence, making the per se test different from true standards of per se illegality and more like one of presumed illegality. *See Susser v. Carvel Corp.*, 332 F.2d 505, 520 (2d Cir.

nance and Exclusive Dealing. *See, e.g., United States v. Addyston Pipe & Steel Co.*, 85 F. 271 (6th Cir.1898), *aff'd*, 175 U.S. 211, 20 S.Ct. 96, 44 L.Ed. 136 (1899). But no such common law practices were alleged here.

**27.** "[I]t shall be unlawful for any person engaged in commerce, in the course of such commerce, to lease or make a sale or contract for sale of goods, wares, merchandise, machinery, supplies or other commodities, whether patented or unpatented, for use, consumption or resale within the United States or any Territory thereof or the District of Columbia or any insular possession or other place under the jurisdiction of the United States, or fix a price charged therefor, or discount from, or rebate upon, such price, on the condition, agreement or understanding that the lessee or purchaser thereof shall not use or deal in the goods, wares, merchandise, machinery, supplies, or other commodities of a competitor or competitors of the lessor or seller, where the effect of such lease, sale, or contract for sale or such condition, agreement or understanding may be to substantially lessen competition or tend to create a monopoly in any line of commerce." 15 U.S.C. § 14 (1976).

**28.** "Every contract, combination in the form of trust or otherwise, or conspiracy, in restraint of trade or commerce among the several States, or with foreign nations, is declared to be illegal. Every person who shall make any contract or engage in any combination or conspiracy declared by sections 1 or 7 of this title to be illegal shall be deemed guilty of a felony, and, on conviction thereof, shall be punished by fine not exceeding one million dollars if a corporation, or, if any other person, one hundred thousand dollars, or by imprisonment not exceeding three years, or by both said punishments, in the discretion of the court." 15 U.S.C. § 1 (1976).

1964), *cert. dismissed,* 381 U.S. 125, 85 S.Ct. 1364, 14 L.Ed.2d 284 (1965).

■ The Court finds that Nehi cannot prove all four elements of its tying counterclaim, and therefore will grant summary judgment. The parties do not contest that the purportedly tied and tying items—gas and gas pumps—entail separate product markets. But, Nehi has failed to make an inference either that it was coerced to purchase the tied item or that it was even sold the item.

### a. *Sale of the Tied Product*

■ As a precondition to a tying claim, the buyer must actually purchase or lease the unwanted product. *Grandstaff v. Mobil Oil Corp.,* 1979–1 Trade Cas. (CCH) ¶ 62,421 at 76,538 (E.D.Ca.1978). Merely accepting something provided for free does not constitute an impermissible tie-in. *Directory Sales Management Corp. v. The Ohio Bell Telephone Co.,* 1986–2 Trade Cas. (CCH) ¶ 67,250 at 61,289–90 (N.D.Oh. 1986). *See Response of Carolina, Inc. v. Leasco Response, Inc.,* 537 F.2d 1307, 1327 (5th Cir.1976).

Nothing in the record indicates that Nehi either leased or bought any gasoline dispensing equipment from Kellam. The contracts between Kellam and Nehi expressly provide that Kellam "agrees to loan" to Nehi the gasoline pumping equipment, with an option to have Nehi purchase the equipment from Kellam at the end of the contract. (Ap. at A10–A20). Nehi paid no money for the equipment, nor did it ever possess legal title, dominion or control over the goods.

■ Nehi alternatively maintains that because the contracts contain an option to sell the underground tanks at the end of the contract term, there is actually a sale of the tied product. (Answering Brief at 102). But the purchase of the tied product must be made contemporaneously with the sale of the tying product. Prior sales or prospective purchases are insufficient to give rise to an actionable tying arrangement. *A.I. Root v. Computer Dynamics, Inc.,* 806 F.2d 673 (6th Cir.1986); *Fox Mo-*

*tors, Inc. v. Mazda Distributors (Gulf), Inc.,* 806 F.2d 953, 958 (10th Cir.1986).

■ Nehi also suggests that the equipment loan was actually a lease because Kellam calculated a rate of return on its investment. (Floyd Dep. at 155–157). But no evidence supports the inference that somehow Kellam established a rate of return on the gasoline pumps loaned to Nehi. The deposition testimony offered by a Kellam officer, Allen Floyd, establishes only that there may have been some documents indicating that the gas pump equipment was amortized over a certain number of years. But there are no documents to support this vague assertion. Moreover, to establish that the equipment lease was actually a loan, Nehi must prove that the price of gasoline secretly included an equipment rental fee. *Directory Sales Management,* 1986–2 Trade Cas. (CCH) at 61,289.

All the evidence on the record refutes any such notion. Kellam's representatives testified that its gasoline prices were set in accordance with the retail market. This resulted in Kellam never having an established margin between its buying price and its selling price. (Polk Kellam Dep. at 106). Occasionally, Kellam would earn no margin or even negative margins (losses) on gasoline sold through its equipment. (Polk Kellam Dep. at 106, 231–32). Without any established minimum, there can be no inference of secret rental payments; Nehi cannot support the inference of a sale or lease of the gasoline equipment.

### b. *Coercion*

The record also indicates that Nehi cannot establish the second element of a tying claim—that the availability of the tying item has been "conditioned" upon purchase or rental of the tied item. The Courts interpret this requirement to mean that the buyer was coerced into purchasing the tied item.

In *Ungar v. Dunkin Donuts of America, Inc.,* 531 F.2d 1211, 1218 (3d Cir.1976), *cert. denied,* 429 U.S. 823, 97 S.Ct. 74, 50 L.Ed.2d 84 (1976), the Third Circuit held that in order to establish an illegal tie, it is not enough to show that the seller has

sufficient economic power and that the two products were purchased together. A customer alleging an illegal tie-in must prove that he was coerced into buying the tied product. Nehi suggests that *Bogosian v. Gulf Oil Corp.*, 561 F.2d 434 (3d Cir.1977), *cert. denied*, 434 U.S. 1086, 98 S.Ct. 1280, 55 L.Ed.2d 791 (1978 eliminated proof of coercion as an essential element of a tying claim.

■ But a close reading of *Bogosian* and subsequent Supreme Court precedent indicates that the case did not repudiate the coercion requirement. A recent Third Circuit case emphasized that "a tying arrangement requires a seller with sufficient economic power in the tying product to coerce the buyer into also buying an unwanted tied product." *Columbia Pictures Industries, Inc. v. Redd Horne, Inc.*, 749 F.2d 154, 162 (3d Cir.1984), *citing Ungar*. All *Bogosian* held was is that a prima facie case of coercion is established when a contract expressly conditions the sale of one product on the purchase of another. 561 F.2d at 452. The contracts do not state that in order to get Kellam gasoline, Nehi must use Kellam equipment. Nehi is free to pump Kellam gas through its own or someone else's dispensing equipment; Nehi only is obligated to purchase all gasoline sold at certain Super Soda Centers from Kellam.[29]

Even *Bogosian*'s narrow holding is no longer valid after the Supreme Court reconsideration of per se tying agreements in *Jefferson Parish Hospital District No. 2 v. Hyde*, 466 U.S. 2, 104 S.Ct. 1551, 80 L.Ed.2d 2 (1984). The Court there suggested that direct proof of coercion is essential to maintain an action for an illegal tie-in. "Our cases have concluded that the essential characteristics of an invalid tying arrangement lies in the seller's exploitation of its control over the tying product to force them into the purchase of a tied product" suggested the Court. "When

such 'forcing' is present, competition on the merits in the market for the tied item is restrained and the Sherman Act is violated." *Id.* at 12–13, 104 S.Ct. at 1558. This language led the *Bogosian* District Court to conclude that the Supreme Court had probably overruled the Third Circuit's holding that direct proof of coercion is unnecessary in certain limited circumstances. *Bogosian v. Gulf Oil Corp.*, 596 F.Supp. 62, 76 (E.D.Pa.1984).

■ There is no evidence on the record that Kellam refused to sell gasoline unless Nehi consented to the installation of Kellam-owned equipment. Nor is there any evidence that Nehi would have preferred to outlay its own capital to purchase its own tanks and gasoline dispensing equipment. The only evidence on the record suggests that Nehi was amenable to the use of Kellam equipment because it did not have to undertake an investment. For example, defendant Duncan recalls that prior to his initial meetings with Kellam officers—Allen Floyd and Lucius Kellam, Jr.—one of his acquaintences in the business suggested that Duncan try Kellam Energy for his initial foray into the gasoline business because they would readily put in installations. Duncan stated that "[i]t was agreed at the end of that meeting that we would proceed with the installation." (Duncan Dep. at 231 and 371).

Soon after, Duncan approached Kellam for a contract at another location. At the second meeting, it appeared that Nehi, not Kellam, was aggressively pursuing a contractual arrangement whereby Kellam would install its equipment. "[T]hey [Kellam] were more acquiescent to install additional locations at any of our stores, under the same conditions and terms...." (Duncan Dep. at 398–99).

There is no evidence that the tied product—gas pumps—was either sold or leased

---

29. Nehi is trying to create a tying claim out of an exclusive dealing contract. Tying and exclusive dealings are different types of conduct requiring proof of different elements. Tying requires a purchaser who desires to buy product A also buy some quantity of product B. Exclusive

dealings requires a purchaser, who desires to buy product A to refrain from buying any of product A from a different supplier. Steuer, *Exclusive Dealing in Distribution*, 69 Cornell L.Rev. 101, 104 n. 18 (1983). *See* Bork, *The Antitrust Paradox* 365 (1978).

to Nehi or that Nehi was coerced into accepted the tied product.[30]

Nehi's tying counterclaim makes little common sense. The corrosive impact of a tying arrangement is that it restrains competition in the market for the tied product. *Susser v. Carvel Corp.*, 332 F.2d at 511. The customer who purchases the products linked together is injured because he either pays too much for the "tied" product or receives inferior goods. *Pogue v. International Industries, Inc.*, 524 F.2d 342, 344 (6th Cir.1975). It appears improbable to this Court that an actionable tie-in exists when a customer receives goods of admittedly superior quality without having to make any up-front investment. It is equally improbable to believe that a buyer would have to be "forced" to accept such an arrangement. It is this forcing that renders tie-in arrangements subject to antitrust scrutiny. And the Supreme Court has cautioned against entertaining claims that are based on no "plausible" or "rational economic motive." *Matsushita*, 106 S.Ct. at 1360. This is precisely such a claim and therefore summary judgment will be granted.[31]

### 2. *Exclusive Dealing*

Count V of the Amended Counterclaim alleges that the exclusive dealing provision of each requirements contract between Nehi and Kellam violates Section 3 of the Clayton Act. 15 U.S.C. § 14 (1976). (Amended Counterclaim ¶ 64). Each contract obligates Nehi to purchase from Kellam all petroleum products sold at that particular Super Soda Center. In return, Kellam supplied the outlets and loaned Nehi the necessary gasoline dispensing equipment. Between the time the first contract was signed in May, 1975 and March, 1983 all gasoline sold at the seven Super Soda Centers was actually purchased from Kellam. (Defendants' Answer to Requests Nos. 1–7 of Plaintiff's First Request for Admissions).

### a. *Whether An Arrangement Existed*

The first inquiry in an exclusive dealing claim is whether an actionable exclusive dealing arrangement existed between the parties. *T.A.M., Inc. v. Gulf Oil Corp.*, 553 F.Supp. at 504, *quoting Tampa Electric Co. v. Nashville Coal Co.*, 365 U.S. 320 at 327, 335, 81 S.Ct. 623 at 628, 632, 5 L.Ed.2d 580. "An exclusive dealing arrangement is one in which the seller will only deal with the buyer if the buyer agrees to purchase all of its requirements from the seller." *Satellite Financial Planning Corp. v. First National Bank of Wilmington*, 643 F.Supp. 449, 452 (D.Del. 1986), *citing Standard Oil Co. v. United States*, 337 U.S. 293, 296, 69 S.Ct. 1051, 1053, 93 L.Ed. 1371 (1949). Nehi fails to pass this threshold test because it cannot demonstrate that the contracts between the parties obligate Nehi to purchase the company's entire gasoline supply from Kellam.

Nothing in the requirements contracts between the parties restricts Nehi from purchasing gasoline from other suppliers at Nehi's other Super Soda Outlets. Each contract applies only to a particular location, and the record reveals that Nehi dealt openly with other wholesalers. Five of Nehi's locations are not supplied by Kellam. (Duncan Dep. at 686). To constitute

---

**30.** An alternative holding for granting summary judgment is a Supreme Court case that specifically upheld the arrangement between the parties here. In *FTC v. Sinclair Refining Co.*, 261 U.S. 463, 43 S.Ct. 450, 67 L.Ed. 746 (1922), the Court held that Sinclair Refining's practice of leasing underground tanks with pumps to retail dealers at nominal rentals upon the condition that the equipment shall be used only with Sinclair's gasoline was not violative of the Clayton Act. This undercuts Nehi's claims under both the Clayton and the Sherman Acts because the former statute imposes a tighter restraint on competitive behavior than does the latter. Conduct "which satisfies the test of legality set out in the Clayton Act would *a fortiori* be lawful under the less stringent Sherman Act." *American Motor Inns, Inc. v. Holiday Inns*, 521 F.2d 1230, 1250 (3d Cir.1975). Nehi does not dispute the validity of *Sinclair's* holding.

**31.** The Court, therefore, does not have to consider the parties' arguments concerning the third and fourth elements of the tying claims: whether Nehi can prove sufficient economic power in the tying market to appreciably affect the tied market or whether a "not insubstantial" amount of commerce in the "tied market" has been affected.

actionable exclusive dealing, a contract must apply to all purchases that the buyer will make. *See Petroleum for Contractors, Inc. v. Mobil Oil Corp.,* 493 F.Supp. 320, 325 (S.D.N.Y.1980).

The law takes no cognizance of the segmented exclusive dealing claim advocated by defendant. In *Empire Volkswagen, Inc. v. World-Wide Volkswagen Corp.,* 627 F.Supp. 1202 (S.D.N.Y.1986), *aff'd., Empire Volkswagen, Inc. v. World-Wide Volkswagen Corp.,* 814 F.2d 90, 1987–1 Trade Cas. ¶ 67,480 (2d Cir.1987), the defendant forbade its franchisees from selling another manufacturer's automobiles from the sale facility of defendant's vehicles. In granting the defendant's summary judgment motion, the court held that "[t]he undisputed facts show the dealership arrangement defendant attempted to impose on plaintiffs was not an exclusive arrangement." *Id.* at 1206. There is no difference between Volkswagen's requirement that only its automobiles be sold at a particular showroom and Kellam's requirement that only Kellam gas be sold at certain locations. In either case, the buyer is at liberty to deal with other suppliers so long as the buyer does it somewhere else.

### b. *A Significant Anti-Competitive Effect*

■ Even assuming an arrangement existed, exclusive dealing arrangements are not per se illegal. *Tampa Electric,* 365 U.S. at 327, 81 S.Ct. at 628. In certain circumstances, these arrangements actually enhance competition. *See White and White, Inc. v. American Hospital Supply Corp.,* 540 F.Supp. 951, 1027 (W.D.Mich. 1982), *rev'd. on other grounds,* 723 F.2d 495 (6th Cir.1983); *Standard Oil Co. and Standard Stations v. United States,* 337 U.S. 293, 69 S.Ct. 1051, 93 L.Ed. 1371 (1949) (requirements contracts are of economic advantage to the buyer because they assure supply and afford protection against price rises; they reduce seller's expenses and offer predictable markets). Because of this, courts, assuming they find an exclusive dealing arrangement—which has not been found here—must then inquire as to whether these agreements were unlawful

and had "significant anticompetitive effect." *Satellite Financial Planning Corp. v. First National Bank of Wilmington,* 633 F.Supp. 386, 398 (D.Del.1986), *mod. in part on reconsideration,* 643 F.Supp. 449 (1986). In *Tampa Electric,* the Supreme Court set forth a three-step analysis for evaluating the legitimacy of exclusive dealing arrangements under the Clayton Act:

> First, the line of commerce ... involved must be determined, where it is in controversy, on the basis of the facts peculiar to the case. Second, the [geographic] area of effective competition in the known line of commerce must be charted ... Third and last, the competition foreclosed by the contract must be found to constitute a substantial share of the relevant market. *Tampa Electric,* 365 U.S. at 327–28 [81 S.Ct. at 628], *quoted in American Motor Inns, Inc. v. Holiday Inns, Inc.,* 521 F.2d 1230, 1250 (3d Cir. 1975).

■ There is no dispute that the relevant geographic market is the Delmarva Peninsula. But the defendant has not alleged a legally cognizable line of commerce nor has he produced any evidence establishing that the contracts foreclosed a substantial share of competition.

### i. *The Relevant Line of Commerce*

Nehi asserts that the relevant line of commerce is convenience stores which sell gasoline or, alternatively, all convenience stores. (Amended Counterclaim ¶¶ 39, 64). But the relevant product market cannot be defined simply in the terms alleged by plaintiff. *United States v. Du Pont,* 351 U.S. 377, 394–95, 76 S.Ct. 994, 1006–07, 100 L.Ed. 1264 (1956) (cellophane), (A court must consider all commodities that are reasonably interchangeable for the purposes for which they were produced.).

To prove that "convenience stores which sell petroleum products" constitutes a relevant product market, for purposes of an exclusive dealing claim, the counterclaimant must prove that a significantly large number of consumers do not consider gas-

oline sold at convenience stores to be interchangeable with gasoline sold at other types of retail outlets. *Mullis v. Arco Petroleum Corp.*, 502 F.2d 290, 196–97 (7th Cir.1974). Defendants must prove that convenience stores do not compete with self service outlets and service stations in the sale of gasoline. *See Brown Shoe Co. v. United States*, 370 U.S. 294, 326, 82 S.Ct. 1502, 1524, 8 L.Ed.2d 510 (1962); *United States v. Consolidated Foods Corp.*, 455 F.Supp. 108, 126 (E.D.Pa.1978). "The appropriate market in which to examine the competitive effect is the market for products that compete with or are reasonably interchangeable with the products subject to the exclusive dealing arrangement." P. Zeidman, *The Legal Aspects of Selling and Buying*, § 4.47 at 174–75 (1982) (*citing American Motor Inns*).[32]

The record establishes that, for purposes of an exclusive dealing counterclaim, the relevant market must be that for petroleum products. The requirements contracts themselves limit exclusivity only with respect to gasoline; they say nothing about all convenience store sales. Further, on the record, Nehi's own testimony establishes that consumers can shift their gasoline purchases to non-convenience store outlets. In his deposition, Duncan admitted that all types of retail gasoline outlets compete with one another for customers. (Duncan Dep. at 171–73).

Kellam has established, as a matter of law, that the relevant line of commerce for exclusive dealing purposes is sales of gasoline.

### ii. *Significant Impact on Competition*

The Third Circuit has adopted the "qualitative substantiality" test for determining whether a company's requirements contracts have a significant impact on competition. In applying this test:

'it is necessary to weigh the probable effect of the contract on the relevant area of effective competition, taking into account the relative strength of the parties, the proportionate volume of commerce involved in relation to the total volume of commerce in the relevant market area, and the probable immediate and future effects which pre-emption of that share of the market might have on effective competition therein.' *American Motor Inns*, 521 F.2d. at 1250 (3d Cir.1975), *quoting Tampa Electric Co. v. Nashville Coal Co.*, 365 U.S. 320, 335 [81 S.Ct. 623, 632, 5 L.Ed.2d 580] (1961).

In the case at bar, Nehi concedes that it does not have any data indicating what percentage of all retail gasoline outlets located on the Delmarva Peninsula are foreclosed to Kellam's competitors as a result of the requirements contracts.[33] (Fenili Dep. at 69). Nehi also concedes that it is unaware of any data regarding the wholesale sale of gasoline on the Delmarva Peninsula; its experts have done no analysis to determine Kellam's share of that market. (Lane Dep. at 142–43, 149). The lack of market measure entitles Kellam to summary judgment in its favor.[34] *Satel-*

---

**32.** Note that the market for an exclusive dealing claim can be different than the market for an attempted monopolization claim. In the former, the courts are concerned with the market in the product that is the subject of arrangement. In the latter, courts are concerned about a defendant exercising monopoly power in the claimants' market. *See infra* note 33.

**33.** A mere showing that the exclusive arrangement involves a substantial number of dollars is insufficient to prove a significant anti-competitive effect. *Susser v. Carvel Corp.*, 332 F.2d 505, 516 (2d Cir.1964). When exclusive dealing is condemned, it is because it substantially forecloses the opportunity for the seller's competitors to enter into or remain in the market. *Tampa Electric Co.*, 365 U.S. at 327, 328, 81 S.Ct. at 628, 628. Anticompetitive effect in an exclu-

sive dealing contest is measured in the seller's market, not the buyer's. *See T.A.M., Inc. v. Gulf Oil Corp.*, 553 F.Supp. 499, 505 (E.D.Pa.1982).

**34.** Plaintiffs urge this Court to adopt the Seventh Circuit's exclusive dealing test as created in *Roland Machinery Co. v. Dresser Industries, Inc.*, 749 F.2d 380 (7th Cir.1984). This two part test requires claimant to prove that an exclusive dealing arrangement will keep at least one significant competitor of the defendant from doing business and second that the probable effect of the exclusion will be to raise prices above the competitive level. The Court declines to adopt this test and does not have to because it finds that, as a matter of law, Nehi could not meet the qualitative substantiality test outlined in *American Motor Inns, Inc. v. Holiday Inns*, 521 F.2d 1230 (3d Cir.1975).

*lite Television & Associates Resources, Inc. v. Continental Cablevision of Virginia, Inc.*, 714 F.2d 351, 357 (4th Cir.1983), *cert. denied,* 465 U.S. 1027, 104 S.Ct. 1285, 79 L.Ed.2d 688 (1984); *Linmont Properties, Inc. v. Newman,* 1980–81 Trade Cas. (CCH) ¶ 63,773 at 78,116 (E.D.N.Y.1980) (exclusive dealing claim dismissed because "[p]laintiffs have failed to show the extent to which competitors who wished to enter the relevant market for the supply of gasoline and petroleum products were limited by the exclusive requirements contract....").

Because Nehi can demonstrate neither an exclusive dealing arrangement nor a significant anti-competitive effect, summary judgment is granted in favor of Kellam on the exclusive dealing counterclaim.

### 3. *Resale Price Maintenance*

Count III of the Amended Counterclaim alleges that Kellam violated Section 1 of the Sherman Act by "fixing" Super Soda gas prices. Nehi asserts that the commissioned agent system constitutes automatic resale price fixing because Kellam set the retail price for gasoline sold at Super Soda Centers. (Amended Counterclaim, ¶¶ 52–54). Once the parties switched to a "metering" system, Nehi alleges that Kellam engaged in resale price maintenance by artificially raising and lowering the wholesale price of gasoline so that Nehi could not set a competitive retail price and still make a profit. (Amended Counterclaim, ¶ 55).

Retail price fixing, like tying, is another vertical restraint on trade that diminishes competition and the Supreme Court outlawed such practice in *Simpson v. Union Oil Co. of California,* 377 U.S. 13, 84 S.Ct. 1051, 12 L.Ed.2d 98 (1964). That case held a purported "consignment" arrangement between an oil company and a retailer illegal because it prohibited the re-

tailer from setting its own resale prices for the oil company's product.

*Simpson,* however, does not outlaw every consignment arrangement. The cases interpreting *Simpson* look to the particular facts of the relationship between the wholesaler and the retailer. To the extent that the retailer is considered an agent of the wholesaler, the wholesaler may set the prices of the retailer without an antitrust violation. If a retailer is viewed as an independent contractor, the wholesaler may not establish prices without violating the laws. A survey of the price fixing cases decided since *Simpson,* concluded that "[t]hese cases demonstrate that the key issue presented by an antitrust challenge to a consignment agreement is whether the dealer is an independent contractor or an employee of the consignor ... In essence, the issue is resolved by the extent to which the consignor assumes the working capital investment in the retail premises under consideration and to the extent the consignor bears the risk of the market." *Everhart v. United Refining Co.,* 1980–81 Trade Cas. (CCH) ¶ 63,788 (N.D.Ohio 1980) (and cases cited therein).[35]

There is a significant question of material fact as to whether Nehi was an independent retailer or an agent of Kellam. The record indicates that Nehi is responsible for casualty losses, gasoline taxes and business licenses; Nehi controls the use of its own property and has made no payments to Kellam denominated as rent. (Duncan Aff. ¶¶ 5, 6). Nehi is a discount store with its own image and management style. Kellam's response is that it is responsible for all costs associated with the purchasing and installing of tanks, canopies, consoles and gasoline dispensing equipment. However, both the original contract and the 1976 contract forms place the risk of loss on the buyer, Nehi. (Ap. at

---

**35.** Section 1 of the Sherman Act, requires proof of a "contract, combination, ... or conspiracy." *Bogosian v. Gulf Oil Corp.,* 561 F.2d 434, 445–46 (3d Cir.1977), *cert.denied,* 434 U.S. 1086, 98 S.Ct. 1280, 55 L.Ed.2d 791 (1978). "Unilateral action, no matter what its motivation, cannot violate Section 1." *Edward J. Sweeney & Sons, Inc. v.*

*Texaco, Inc.,* 637 F.2d 105, 110 (3d Cir.1980), *cert.denied,* 451 U.S. 911, 101 S.Ct. 1981, 68 L.Ed.2d 300 (1981); *accord, Harold Friedman, Inc. v. Kroger Co.,* 581 F.2d 1068, 1071 (3d Cir.1978). A finding that Nehi is an independent agent would provide the requisite co-conspirator with whom Kellam would conspire.

A11–A23, ¶ 5).[36] This explicit contract provision is supported by the fact that Kellam kept on its books a balance in the form of an accounts receivable that measured the difference between the amount of gasoline delivered to each station and the stick readings. (Constanza Dep. pp. 59–61; E. Polk Kellam Dep. pp. 17–24).[37]

Whether the Kellam-Nehi relationship was one of agency or independent contractor or whether coercion was involved in setting prices, is a matter of fact for the jury, and is inappropriate for summary judgment.

■ The Court will, however, grant summary judgment on Nehi's resale price maintenance counterclaim for the period after 1984. During that period, Nehi set the price of gasoline sold at the Super Soda Centers. Nehi, however, suggests, in its Amended Counterclaim, that Kellam "fixed" the retail price of gasoline by raising and lowering the wholesale price. (Amended Counterclaim, ¶ 55).

But a claim for resale price maintenance must be dismissed in the absence of evidence that Kellam coerced Nehi into setting prices, in satisfaction of the concerted action requirement of the Sherman Act, Section 1. *Lehrman v. Gulf Oil Corp.*, *supra*, 464 F.2d 26, 37 (5th Cir.1972), *cert. denied*, 409 U.S. 1077, 93 S.Ct. 687, 34 L.Ed.2d 665 (1972). Nehi concedes that nobody from Kellam ever made any suggestions about retail pricing during the period in which Nehi purchased gas under the metering system. Nehi attempts to imply "coercion" by claiming that its ability to set a particular retail price was constrained by the wholesale price at which Kellam sold them petroleum products. But a price established by contract between a buyer and a seller does not, without more, violate the antitrust laws. *Sitkin Smelting & Refining Co. v. FMC Corp.*, 575 F.2d 440, 446 (3d Cir.), *cert. denied*, 439 U.S. 866, 99 S.Ct. 191, 58 L.Ed.2d 176 (1978). "Only if such an agreement contains restrictions on one party's activities other than those involved in the immediate purchase or sale does the possibility of a Sherman Act violation arise." *Quality Auto Body v. Allstate Insurance Co.*, 660 F.2d 1195, 1203 (7th Cir.1981), *cert. denied*, 455 U.S. 1020, 102 S.Ct. 1717, 72 L.Ed.2d 138 (1982). *See also AAA Liquors, Inc. v. Joseph E. Seagram and Sons*, 705 F.2d 1203 (10th Cir. 1982), *cert. denied*, 461 U.S. 919, 103 S.Ct. 1903, 77 L.Ed.2d 290 (1983).

The precise argument advanced by Nehi was rejected in *Butera v. Sun Oil Company, Inc.*, 496 F.2d 434 (1st Cir.1974). The plaintiff in that case owned a retail gas station under a supply contract with Sun Oil. Plaintiff purchased his gas from Sun at an established dealer tank price and then received price adjustments depending on retail conditions. Plaintiff claimed that this price system constituted resale price maintenance because Sun could "force" its dealers to charge particular retail prices by manipulating the wholesale price until compliance was achieved. *Id.* at 436. Plaintiff admitted that he set his own prices and was not pressed by Sun. The District Court granted Sun's motion for summary judgment, ruling that the company had only changed wholesale prices and "more than that must be shown to constitute a violation of Section 1 of the Sherman Act." *Id.* at 435, 437–438. The Circuit Court affirmed, holding that "such economic impact as follows from Sun's tight control of its own wholesale pricing is not a Sherman Act violation." *Id.* at 437–38.

---

**36.** The Court concurs with Kellam that Nehi's reliance on *Automatic Comfort Corp. v. D & R Service*, 620 F.Supp. 1349 (D.C.Conn.1985) is misplaced because that case was a Petroleum Marketing Act action.

**37.** Kellam suggests that because the commissioned agent system did not apply to thousands of dealers in a vast geographic area, as did the consignment question invalidated in *Simpson*, that no violation can be made out. In 1984, the company had requirements arrangements with 35 company-owned outlets and 74 third party outlets. (Polk Kellam Aff. ¶¶ 13, 18). But Kellam may be a significant player in the geographically isolated Delmarva Peninsula market. As such it may meet the *Simpson* requirements; indeed, the Court notes that the rigid requirements of *Simpson* cannot be applied in every case.

Nothing in the record suggest that during the metering period anyone other than Nehi set the retail price charged for gas at the Super Soda outlets. (Duncan Dep. at 422, 450). The record forcefully establishes that Nehi cannot claim that Kellam set retail prices after the introduction of the metering system in 1984.[38]

Accordingly, summary judgment must be granted in favor of Kellam for the resale price maintenance counterclaim after January 1, 1985.

### 4. *Attempted Monopolization*

■■■■ In Count VI of its Amended Counterclaim, Nehi alleges that Kellam monopolized, and attempted to monopolize, the convenience store market in violation of Section 2 of the Sherman Antitrust Act.[39] (Amended Counterclaim, ¶¶ 67 and 68). Nehi has abandoned its monopoly counterclaim, contending that "Kellam continues to stray under the false belief that this is a monopolization case." Answering Brief at 112, n. 32.[40] The more serious problem is whether Nehi can sustain a valid claim for attempted monopoly. Section 2 of the Sherman Act is concerned with a firm's power to control prices or exclude competition. *Columbia Metal Culvert Co. v. Kaiser Aluminum and Chemical Corp.*, 579 F.2d 20, 26 (3d Cir.1978), *cert. denied*, 439 U.S. 876, 99 S.Ct. 214, 58 L.Ed.2d 190 (1978). Proof of viable product and geographic markets is a threshold requirement

of an attempt to monopolize claim. *Borough of Lansdale v. Philadelphia Electric Company*, 692 F.2d 307, 311 (3d Cir.1982); *Edward J. Sweeney & Sons, Inc. v. Texaco, Inc.*, 637 F.2d 105, 117 (3d Cir.1980), *cert. denied*, 451 U.S. 911, 101 S.Ct. 1981, 68 L.Ed.2d 300 (1981) (attempt to monopolize).

■■■ To establish an attempted monopolization claim, three threshold requirements must be met. First, claimant must show that defendant has a specific intent to monopolize the relevant market. Second, proof of a relevant product market is required. Third, the claimant must prove that defendant has sufficient market power to come dangerously close to success. *Harold Friedman, Inc. v. Kroger Co.*, 581 F.2d 1068, 1079 (3d Cir.1978), *quoting Coleman Motor Co. v. Chrysler Corp.*, 525 F.2d 1338, 1348 (3d Cir.1975).

Kellam does not dispute that the first element, specific intent to monopolize, may be present. But they do argue that Nehi cannot, as a matter of law, establish the final two elements.

### a. *The Relevant Product Market*

Nehi contends that the relevant product market is "convenience stores which sell petroleum products." (Amended Counterclaim, ¶ 67). Kellam disputes this and makes three arguments. First, Kellam

---

**38.** Consider the Deposition of Robert Duncan, Nehi's owner:

Q. Okay. Under today's system [metering] you set the retail price, correct?
A. Yes.
Q. Has anyone from the Kellam organization ever told you what that retail price should be?
A. Under the current system?
Q. Under the current system.
A. No.
Q. So it is entirely your decision, correct?
A. Yes.
Q. They have never pushed you for any particular price?
A. No.
(Duncan Dep. at 449–50).

**39.** "Every person who shall monopolize, or attempt to monopolize, or combine or conspire with any other person or persons, to monopolize any part of the trade or commerce among

the several States, or with foreign nations, shall be deemed guilty of a felony, and, on conviction thereof, shall be punished by fine not exceeding one million dollars if a corporation, or, if any other person, one hundred thousand dollars, or by imprisonment not exceeding three years, or by both said punishments, in the discretion of the court." 15 U.S.C. § 2 (1976).

**40.** Because Nehi's expert's have not even attempted to demonstrate a monopoly in the market, as defined by Nehi, the monopoly counterclaim is dismissed. In order to maintain an action for monopoly, under Section 2 of the Sherman Act, a claimant must prove not only the relevant market but that the defendant possesses actual monopoly power, meaning the power to control prices or exclude competition. *U.S. v. Grinnell Corp.*, 384 U.S. 563, 86 S.Ct. 1698, 16 L.Ed.2d 778 (1966). There is no evidence that Kellam has that power here.

claims that Nehi must present some cross-elasticity of demand analysis to support its claim as to what is the relevant market. Second, Kellam maintains that Nehi is bound by the testimony of Duncan to the effect that Nehi competes with stores other than convenience outlets that sell gasoline. Finally, Kellam argues that cases that define markets in terms of "cluster of services" are inapposite. The Court is not persuaded.

■ The relevant product market is composed of products "that have reasonable interchangeability for the purpose for which they are produced—price, use and qualities considered. *United States v. Du Pont & Co.*, 351 U.S. 377, 76 S.Ct. 994, 100 L.Ed. 1264, *quoted in Coleman Motor Corp. v. Chrysler Corp.*, 525 F.2d 1338, 1349 (3d Cir.1975). Nehi maintains that the relevant market is convenience stores that sell gas. (Amended Counterclaim, ¶ 67).

■ Citing *Larry Muko, Inc. v. Southwestern Pennsylvania Building*, 670 F.2d 421, 434 (3d Cir.1982), Kellam suggests that some type of cross-elasticity of demand study is necessary and that the overriding concern of the antitrust laws is the significance of price in defining the relevant market. But *Muko* also worried about whether a party can swap one type of product for another. *Muko* at 434. And this is precisely Nehi's concern; they argue that it is impossible to swap, or compare, mere gasoline sales for the cluster of services represented by gasoline plus convenience store sales. Cross-elasticity studies may not be relevant to this product market.[41] (Fenili Dep. 482–492).

Second, Nehi is not bound by the testimony of Duncan. Kellam makes the argument that defendant Duncan's own testimony undercuts any argument that the relevant product market can be defined as convenience stores that sell gasoline because Duncan testified that Super Soda Centers will lose gasoline sales to gasoline stores if

prices are posted as much as one penny higher. (Duncan Dep. at 171–73; Reply Brief at 42). Kellam cites no cases for the proposition that the defendants are bound by the deposition testimony of Duncan, especially in view of other facts in the record that establish that the relevant market is either convenience stores or convenience stores that sell gasoline. (Fenili Dep. at 401–405, and 483–492; E. Polk Kellam Dep. at 648–650).

Finally, Kellam proposes that the cases cited by Nehi to the effect that consumers often shop for a "cluster of services" are inapposite. The Court disagrees. In *United States v. Philadelphia National Bank*, 374 U.S. 321, 83 S.Ct. 1715, 10 L.Ed.2d 915 (1963), the Court found the cluster of products and services denoted by the term "commercial banking" composed a distinct line of commerce. 374 U.S. at 357, 83 S.Ct. at 1738. The Court looked at three factors: distinctive services, cost advantages, and consumer preference as establishing that "commercial banking is a market 'sufficiently inclusive to be meaningful in terms of trade realities.'" *Id.* See also *United States v. Phillipsburg National Bank and Trust Company*, 399 U.S. 350, 90 S.Ct. 2035, 26 L.Ed.2d 658 (1970); *Broadcast Music Inc. v. Columbia Broadcasting System*, 441 U.S. 1, 99 S.Ct. 1551, 60 L.Ed.2d 1 (1979) (music licensing); *J.B.L. Enterprises, Inc. v. Jhirmack Enterprises, Inc.*, 698 F.2d 1011 (9th Cir.1983), *cert. denied*, 464 U.S. 829, 104 S.Ct. 106, 78 L.Ed.2d 109 (1983) (hospital services). The cluster of services approach to defining a relevant product market for the purposes of an attempted monopolization claim is widely recognized. In *Midwestern Waffles, Inc. v. Waffle House, Inc.*, 734 F.2d 705 (11th Cir. 1984), the court defined a market in terms of consumer preference. "This court finds that the relevant product market for determining whether Waffle House is engaged in a monopoly is restaurants similar to Waffle Houses—those with similar menus,

---

**41.** Defining the relevant product market for purposes of an attempted monopolization claim is different than defining the market for an exclusive dealing claim. *See supra* Section III, C. 2. In an exclusive dealing context, the law is only concerned with the market in the product under contract; in the attempted monopolization context, a defendant may attempt to use the product under contract to gain monopoly in a different market.

similar hours and similar service. The Court does not find that the relevant product market is all restaurants of every type, but it does find that there are other restaurants of every kind in the market available to consumers as reasonable substitutes for Waffle Houses." 734 F.2d at 713–14.

There is evidence on the record that if consumers do business at a convenience store, they will, if factors change to turn them away from that convenience store, typically take their business to another convenience store. (Fenili Dep. at 401–405). Even Kellam's President admits that consumers "displayed a positive response to all factors that go into making an outlet an attractive outlet to visit and will continue to do business with such outlets in the future." (E. Polk Kellam Dep. pp. 648–650).

### b. *Dangerous Probability of Success*

The Court cannot accept Kellam's argument that, as a matter of law, it is impossible for Nehi to demonstrate a dangerous probability of succeeding in attaining a monopoly in the relevant market.

### i. *Logical Problems with the Market Share Data*

Kellam makes much of the fact that Nehi supposedly takes different positions as to what the relevant market is. In the Amended Counterclaim, Nehi defines the market as all convenience stores that sell gasoline. (Amended Counterclaim, ¶ 67). Later on, Nehi defines the market as all sales, not just gasoline, at convenience stores that sell gasoline. (Lane Dep. at 185). Still later, Nehi's experts define the market further to include *all* sales at *all* convenience stores whether they sell gasoline or not. (Fenili Dep. at 436).

Because of this shifting definition, Kellam moves for summary judgment on the grounds: (1) that Nehi has no data on all sales at convenience stores that sell gas; or (2) Nehi has no data on all sales at all convenience stores. Nehi only has data on gas sales at convenience stores; Kellam suggests that Nehi has simply failed to come forward with any facts to prove a dangerous probability of succeeding in monopolizing the other markets mentioned by Nehi's experts.

Nehi responds that its data is sufficient for two reasons. First, Nehi's experts suggest that gasoline sales drive inside sales, so that the data on gasoline sales at convenience stores that sell gasoline is relevant. (Lane Dep. at 183–190). It is not only relevant, but because there is a correlation, it is the best indicator of inside sales.

Second, Nehi's experts testified that the number of convenience stores in the relevant geographic area—the Delmarva Peninsula—is so insignificant in number as to be irrelevant. (Fenili Dep. at 434–435). This makes intuitive sense to the Court. In an isolated geographic region, a trip to the convenience store means a trip in an automobile, and gasoline would be a logical complement to any convenience store business.

The precise definition of the relevant market is left to the jury. *Coleman Motor Co. v. Chrysler Corp.*, 525 F.2d 1338, 1349 (3d Cir.1975). But at this stage, the Court notes that Nehi's experts have put forth sufficient facts to demonstrate that the relevant market is defined one of three ways, and that all three markets are quite similar, if not directly related: either, (1) gasoline sales at convenience stores that sell gas; (2) all sales at convenience stores that sell gas; or, (3) all sales at all convenience stores.

### ii. *The Market Share Data*

Nehi has not only alleged a relevant market, it has accumulated and provided data showing Kellam's market strength in that market. Specifically, Nehi's experts testified that Shore Stop and Kellam supplied outlets accounted for as much as 43.8% of the gasoline sold by convenience stores that sell gas in Delaware in 1984. (Defendants' Answering Brief at 571; Lane Dep. at 183–191; Fenili Dep. at 245–249, 315–320). In Maryland, this percentage was 35.9%, and, as to Virginia, the experts estimated that Kellam controlled over 50% of the market in that area. (*Id.* at 57–58).

Kellam responds that the market share numbers shown by Nehi are insufficient to demonstrate a dangerous probability of monopolization. Kellam relies principally on two cases. First, Kellam suggests that, as a matter of law, a claimant must show that a monopolist has a 68% market share to demonstrate a dangerous probability of market dominance. *N.W. Controls, Inc. v. Outboard Marine Corp.*, 333 F.Supp. 493, 517 n. 23 (D.Del.1971). Kellam also asserts that *International Distribution Centers, Inc. v. Walsh Trucking Co., Inc.*, —— U.S. ——, 107 S.Ct. 3188, 96 L.Ed.2d 676, 1987–2 Trade Cas. (CCH) ¶ 67,457 (2d Cir.1987) stands for the proposition that a 50% market share is insufficient to demonstrate a dangerous probability of success. (Opening Brief at 76–77).

■ Demonstrating a particular market share alone is not the only yardstick by which courts measure a dangerous probability of success. Even if it were, courts have found that a demonstration of 35% market share is sufficient to demonstrate a dangerous probability of success. *Outboard Marine Corp. v. Pezetel*, 461 F.Supp. 384, 404, 406 (D.Del.1978) (35% market share constitutes a "reasonable probability of success sufficient to show an attempt to monopolize, if the critical element of § 2, namely, specific intent, can be shown.").

If the Court were to follow *Outboard Marine*, Nehi will survive summary judgment because its experts' analysis suggests that Kellam possessed greater than a 35% market share in the market for convenience stores that sell gasoline in the three states that comprise the Delmarva Peninsula— Delaware, Maryland and Virginia.

### iii. *Other Factors Beyond Market Share*

■ The cases relied on by Kellam do not stand for the proposition that mere market share data is sufficient indicia of dangerous probability of success. Rather, *Walsh Trucking* held that "market share analysis, while essential, is not necessarily determinative in the calculation of monopoly power ... [o]ther market characteristics

must also be considered in determining whether a given firm ... has a dangerous probability of acquiring monopoly power ... Among these characteristics are the strength of competition, the probable development of the industry, the barriers to entry, the nature of the anticompetitive conduct and the elasticity of consumer demand." *Id.* at 59,911.

Nor does *N.W. Controls*, hold that a 68% market share is required to make out a dangerous probability of success claim. The court in *N.W. Controls* examined other factors, such as whether the defendant "possessed the power to control prices or exclude competitors." *Id.* at 515. The court specifically limited its holding that a 68% market share was insufficient to prove a dangerous probability by suggesting that the holding was made "in light of the above facts", meaning the court's detailed examination of other factors, such as those cited in *Walsh Trucking. Id.* at 517 n. 23.

The conventional wisdom is that "market share is not all determinative and may be offset by other evidence bearing upon competitive conditions within the industry, such as proof that the market remains highly competitive, that the defendant controls key materials or technology, and the presence or absence of other barriers to new market entry." W. Holmes, *1986 Antitrust Law Handbook* § 2.03 (1986); *See, e.g., Olsen v. Progressive Music Supply, Inc.*, 703 F.2d 432 (10th Cir.1983); *United States v. Empire Gas Corp.*, 537 F.2d 296, 305 (8th Cir.1976), *cert. denied*, 429 U.S. 1122, 97 S.Ct. 1158, 51 L.Ed.2d 572 (1977); *Kearney & Trecker Corp. v. Giddings & Lewis, Inc.*, 452 F.2d 579, 598 (7th Cir. 1971), *cert. denied*, 405 U.S. 1066, 92 S.Ct. 1500, 31 L.Ed.2d 796 (1972).

The record is replete with evidence that the market—defined as convenience stores that sell gasoline on the Delmarva Peninsula—enjoys particularly high barriers to entry such that a local jobber would have a better chance of attaining a monopoly than operators in other markets. First, the Delmarva Peninsula is geographically insular, making gasoline deliveries difficult. (Plaintiff's Further Supplemental Answers

to Defendants' Third Set of Interrogatories at 11) [hereinafter cited as "Supplemental Answers"]; *(see also* Jones Ex. 10; Lucius Kellam, III Ex. 4). "Because of the rural and relatively isolated nature of the Delmarva Peninsula, the set of potential entrants [to the relevant market] is, to a large degree, limited to those firms headquartered within the Peninsula." (Supplemental Answers at 13). Second, the number of competitors on the Delmarva Peninsula is statutorily limited. Divestiture statutes passed in Maryland, Virginia and Delaware prohibit refiners from operating any retail gasoline outlets on the Delmarva Peninsula. *See* Maryland Article 57, 157E; 6 *Del.C.* § 2901, *et.seq.; (see also* Supplemental Answers at 14). Third, entry onto the Delmarva Peninsula is discouraged by the area's longstanding poverty. *Id.*

█ Evidence on the record goes directly to the types of market characteristrics that courts consider important in measuring a dangerous probability of acquiring monopoly power: the strength of the competition, the barriers to entry, the development of the industry, and the nature of the anticompetitive conduct. In considering all these factors, a jury could find that Kellam has a dangerous probability of success of monopolization of the relevant market.[42]

## IV. CONCLUSION

In conclusion, the Court denies Defendants' Motion for Partial Summary Judgment on Kellam's Contract Claims. The Court also denies Plaintiff's Motion for Summary Judgment on Defendants' Contract Counterclaim. The jury will be allowed to hear evidence as to whether either party breached the contracats existing between them.

But the Court does grant Summary Judgment on Count II of Defendants' Amended Counterclaim—the Unfair Competition Counterclaim.

Finally, the Court grants in part and denies in part Summary Judgment on Nehi's Antitrust Counterclaims. Summary Judgment is granted as to Count IV and Count V of the Amended Counterclaim—The Tying and Exclusive Dealing allegations. Summary Judgment is denied as to Count III and Count VI of the Amended Counterclaim—the Price-Fixing and Attempted Monopoly Counterclaims.[43]

An Order will enter in conformity with this Opinion.

**42.** A dangerous probability of success can also be inferred from proof of another element of an attempted monopolization claim—specific intent to monopolize. *Lessig v. Tidewater Oil Co.,* 327 F.2d 459, 474 (9th Cir.), *cert.denied,* 377 U.S. 993, 84 S.Ct. 1920, 12 L.Ed.2d 1046 (1964). *But see Walsh Trucking.* The Third Circuit has not specifically adopted this standard and neither does this Court because there is sufficient evidence of both market share and of other factors to demonstrate a dangerous probability of success.

But the Court does note that there is ample evidence on the record of specific intent to monopolize. Kellam intended to make Shore Stop "the primary retailer of automotive fuels on the Delmarva Peninsula." (Storey Ex. 23). Their marketing strategy for Shore Stop was to "saturate" the Peninsula and "to be competitive in taking over key locations in order that it might pre-empt and limit competition in its marketing area." (E. Polk Kellam Dep. pp. 563

and 566–567). Internal documents reveal that Kellam had a plan to edge out Super Soda from the convenience store industry by creating, in addition to Shore Stop, Kellam's own line of discount centers: "Based on current economic situations, it has become increasingly imperative that we take a more critical look at their [Super Soda's] product mix to determine ways of borrowing some of their customers indefinitely." [sic]. (Struble Ex. 8; Dr. Aff. H–5).

**43.** Summary judgment is, however, granted with respect to ¶ 55 of Count III of the Amended Counterclaim and Nehi will not be permitted to put on evidence of price fixing during the metering period from January 1984 to January 1985.

Similarly, Summary Judgment is granted with respect to Count VI insofar as it alleges that Kellam actually monopolized the market for convenience stores that sell gas. There is no evidence of this.